**Neil JACOBSON, Plaintiff-Appellant,**

v.

**DELTA AIRLINES, INC., a Georgia Corporation, and Hugh Burton, individually and as Customer Service Supervisor of Delta Airlines, Defendants-Appellees.**

**No. CA 82-5477.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 3, 1983.

Submission Withdrawn Dec. 7, 1983.

Resubmitted March 15, 1984.

Decided Sept. 18, 1984.

Stanley Fleishman, Los Angeles, Cal., for plaintiff-appellant.

Peter P. Brotzen, Chase, Rotchford, Drukker & Bogust, Los Angeles, Cal., for defendants-appellees.

Before FARRIS and REINHARDT, Circuit Judges, and SOLOMON,* District Judge.

REINHARDT, Circuit Judge:

Plaintiff is a handicapped person. He challenges Delta Airline's policy of requiring handicapped persons to sign a "medical release form" acknowledging that they may be removed from a flight at any point for specified reasons. In the district court he contended that the policy violated section 404(b) of the Federal Aviation Act, 49 U.S.C. § 1374(b) (1976), section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (1982), and state tort laws. He prayed for damages, injunctive relief, and attorney's fees. The district court granted Delta's motion for summary judgment on the Rehabilitation Act claim, ruling that Delta was not a recipient of federal financial assistance. It submitted the Federal Aviation Act claim and the state-law claim to the jury, and the jury ruled against the plaintiff on all counts.

Plaintiff appeals only the federal claims. He argues that Delta was receiving federal financial assistance when the acts in question occurred and was therefore covered by the Rehabilitation Act. He also argues that Delta's policy violates the Federal Aviation Act as a matter of law. We reverse on the Federal Aviation Act claim but affirm on the Rehabilitation Act claim.

## FACTS

Plaintiff Neil Jacobson has cerebral palsy. He requires a wheelchair to transport himself. His condition is neither contagious nor progressive. He is married, holds a full-time job as a computer programmer analyst, and lectures frequently on, as he puts it, "how wonderful it is to be handicapped." In short, he leads a full and productive life. He cannot, however, walk without the assistance of another person.

On March 1, 1980, he presented himself at the Delta Airlines ticket counter at the Birmingham, Alabama, airport to check his baggage for a return flight to Los Angeles. There, employees of defendant Delta Airlines, including defendant Hugh Burton, refused to allow him to board his flight unless he first signed a so-called "medical release form." It was Delta's policy at the time to require all handicapped persons to sign such a form before boarding.[1] The form provided as follows:

> I understand that upon subsequently acquired medical advise [sic], Delta Airlines may refuse me passage or remove me at any point and refund the appropriate portion of my fare without further obligation. I understand that I may be removed at any point if it becomes necessary for the comfort and safety of other passengers.

Plaintiff initially refused to sign the form, asserting that it discriminated against handicapped persons and was prohibited by federal law. Shortly before the flight's departure, however, plaintiff signed the form under protest, informing the Delta employees that he intended to bring suit. After signing the form, he was permitted to board. He completed the flight without incident.

---

* Honorable Gus J. Solomon, United States District Judge for the District of Oregon, sitting by designation.

1. Delta represented during oral argument that it has since abandoned this policy.

## DISCUSSION

### I. *The Federal Aviation Act Claim.*

Section 404(b) of the Federal Aviation Act prohibits all air carriers from "subject[ing] any particular person ... to any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever." 49 U.S.C. § 1374(b) (1976). Both parties agree that Delta is an "air carrier" subject to section 1374(b). They also agree that 1374(b)'s antidiscrimination provision incorporates the antidiscrimination provision in Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1982). In applying the Federal Aviation Act's antidiscrimination provision to handicapped persons, we therefore refer to the more frequently construed language in section 504 of the Rehabilitation Act and the regulations promulgated thereunder.

Section 504 provides that:

[n]o otherwise qualified handicapped individual ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794 (1982). It is undisputed that the plaintiff is a "handicapped individual." And because under Delta's policy all handicapped persons are required to sign the medical release forms, the policy applies to handicapped persons "solely by reason of [their] handicap[s]." There thus remain only two questions: whether plaintiff was "otherwise qualified" and whether he was subjected to "discrimination" within the meaning of the Rehabilitation Act. Those questions are closely related in this case.

In *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), the Supreme Court defined an "otherwise qualified" person as "one who is able to meet all of a program's requirements in spite of his handicap." *Id.* at 406, 99 S.Ct. at 2367. Rejecting the court of appeals' view that institutions cannot impose requirements that take physical limitations into account, the Court held that even requirements that would exclude persons with handicaps can properly be imposed. It recognized, however, that under some circumstances "an insistence on continuing past requirements and practices might arbitrarily deprive genuinely qualified handicapped persons of the opportunity to participate in a covered program." *Id.* at 412, 99 S.Ct. at 2370. "[S]ituations may arise," the Court said, "where a refusal to modify an existing program might become unreasonable and discriminatory." *Id.* at 412–13, 99 S.Ct. at 2370.

■ *Davis* thus indicates that a person is "otherwise qualified" if he satisfies all of a program's requirements other than those that are "unreasonable and discriminatory." If he does, then section 504 protects him from an institution's continuing insistence on discriminatory requirements. Such an insistence constitutes "discrimination" within the meaning of section 504. Where, as here, the plaintiff is challenging a requirement that he fails to satisfy, the two questions posed above are actually one: Is the requirement "unreasonable and discriminatory"?

Here, plaintiff failed to satisfy Delta's requirement that handicapped persons sign a medical release form before boarding. He is challenging that requirement as unreasonable and discriminatory, at least as applied to persons who, like himself, are simply nonambulatory.

■ An action challenged as discriminatory under the Rehabilitation Act must be given rigorous scrutiny. *See Bentivegna v. United States Department of Labor,* 694 F.2d 619, 621 (9th Cir.1982). We think that Delta's policy does not withstand such scrutiny. Indeed, Delta has failed even to demonstrate that its policy is reasonably related to achieving a legitimate purpose. The justifications Delta has advanced for distinguishing between handicapped and nonhandicapped persons either are based on impermissible assumptions or advance impermissible ends.

The medical release form that Delta required plaintiff to sign was simply an acknowledgement by the signer that he may be refused passage or removed at any point "upon subsequently acquired medical advice" or if it becomes necessary for the comfort and safety of other passengers. The tariffs [2] applicable to Delta make it clear that Delta had the power to remove any passenger at any point if he was unescorted and unable to take care of his physical needs in flight or if it became necessary for the comfort and safety of other passengers. *See* Tariff Rule 35(F)(4)(h); Rule 35(H)(1).[3] Indeed, it appears that Delta had a *duty* under the tariffs to remove such a passenger. *Id.* The only purpose of requiring persons to ·sign the medical release form would thus appear to be to give the signer notice of Delta's power. We assume that a policy designed to achieve such a purpose would be legitimate if applied to all passengers. Delta has offered no legitimate reason, however, for requiring the signatures only from handicapped persons. We find none.

Delta argues that its policy was designed only to comply with its duties under its tariffs. It argues that because handicapped persons are more likely to have problems of the type that would require their removal from a flight, its policy of having only those persons sign the waiver was reasonably related to ensuring compliance with the tariff. However, even if a reasonable relationship to a legitimate purpose would suffice to render the policy valid, *cf. supra* at 1205 (actions challenged under the Rehabilitation Act should be given "rigorous scrutiny"); *Pushkin v. Regents of University of Colorado*, 658 F.2d 1372, 1383 (10th Cir.1981) ("The rational basis test is not applicable where

there is an alleged violation of [section 504]."), Delta's argument would fail.

Delta has not substantiated in any way its assertion that handicapped persons are more likely than others to have problems of the type that would require their removal from a flight. Delta asks us to take judicial notice of the fact that handicapped persons are more likely to have *medical* problems during a flight. We think, however, that such a broad conclusion is not only entirely unwarranted but also prohibited by the Rehabilitation Act. We see no basis for concluding that it is likely that a handicapped person who, for instance, is simply nonambulatory will have some medical problem during a flight. In any event, that likelihood seems no greater than, say, the likelihood that a nonhandicapped person will become boorish as a result of an excessive number of martinis. In fact, we think that Delta's assumption is precisely the type of stereotype that the Rehabilitation Act forbids. As the Supreme Court has said, the plain terms of section 504 indicate that "mere possession of a handicap is not a permissible ground for assuming an inability to function in a particular context." *Davis*, 442 U.S. at 405, 99 S.Ct. at 2366.

■ The only "problem" that we can assume with confidence that nonambulatory persons are likely to have during a flight is a problem in travelling to the lavatory. On a long flight, they are thus likely to require more assistance from airline personnel than ambulatory persons are. That fact does not provide a rational justification for Delta's policy of requiring their signatures on the medical release forms. We hold that both the tariffs and the Rehabilitation Act require Delta, within limits, to provide

**2.** All air carriers are required to file with the Civil Aeronautics Board (CAB) tariffs showing, among other things, "all classifications, rules, regulations, practices, and services in connection with ... air transportation." 49 U.S.C. § 1373(a) (1976). The CAB may reject tariffs that are inconsistent with the statutes and regulations. *Id.* If valid, tariffs filed with the CAB govern the rights and liabilities between airlines

and their passengers. *See Emery Air Freight Corp. v. United States*, 499 F.2d 1255, 1259, 205 Ct.Cl. 49 (1974); *Tishman & Lipp, Inc. v. Delta Air Lines*, 413 F.2d 1401, 1403 (2d Cir.1969).

**3.** References are to the Local and Joint Passenger Rules Tariff No. PR–7, issued on January 7, 1980, and effective January 14, 1980.

the services ordinarily and foreseeably required by nonambulatory persons.

Delta's tariffs require Delta to refuse to transport or to remove at any point any passenger "who is unescorted and is incapable of taking care of his physical needs in flight." Rule 35(F)(4)(h). That clause, standing alone, might suggest that, under the tariffs, Delta must either refuse to transport or remove at any point all nonambulatory persons, for such persons will always require assistance should the need to visit the lavatory arise. The tariffs, however, include an explicit exception for nonambulatory persons. They provide that persons who are unable to walk unassisted but who are otherwise capable of caring for themselves without assistance must be accepted for transportation, subject to specified maximums, if they meet certain conditions. Rule 35(H) exception 2. The maximums vary between three and eight, depending on the type of aircraft. Rule 35(H) exception 2(b). The conditions are (a) that reservations have been made 24 hours in advance, and that the nature of the handicap and assistance required have been explained, Rule 35(H) exception 2(a)(i)(aa) [4]; (b) that the person's physical size or condition permit movement through the aisle at floor level, Rule 35(H) exception 2(a)(ii)(ff)(1); (c) that the person be able to sit in a seat with his seat belt fastened, Rule 35(H) exception 2(a)(ii)(ff)(2); and (d) that the person bear the expenses for "outside services" that might be necessary to accommodate him, Rule 35(H) exception 2(a)(ii)(ff)(3). The tariff specifically provides that Delta "will provide or make whatever arrangements are necessary to assist nonambulatory passengers in boarding and deplaning." *Id.* The tariffs thus make it clear that it is in fact Delta's *obligation*, subject to certain conditions, to transport nonambulatory passengers. They plainly place on Delta the duty to provide the assistance that will ordinarily and foreseeably be required by persons who are incapable of walking alone—assistance not only during a flight but also in

boarding and deplaning. The conditions and the maximums described above were quite obviously designed to limit to a manageable level the degree of accommodation airlines must make for nonambulatory passengers. But it is clear that, subject to those limits, the tariffs contemplate that Delta personnel will provide the required assistance.

Moreover, we think that the Rehabilitation Act *requires* accommodations of the type Delta's tariffs contemplate. Although the Supreme Court has stated that the section 504 does not "impose an affirmative-action obligation on all recipients of federal funds," *Davis*, 442 U.S. at 411, 99 S.Ct. at 2369, it has indicated that the refusal to make accommodations for the handicapped may constitute discrimination. *Id.* at 412, 99 S.Ct. at 2370. It has stated that "the line between a lawful refusal to extend affirmative action and illegal discrimination against handicapped persons [will not] always ... be clear." *Id.* at 412, 99 S.Ct. at 2370. We have said, however, that "[t]he Rehabilitation Act, taken as a whole, mandates significant accommodation for the capabilities and conditions of the handicapped." *Bentivegna*, 694 F.2d at 621. We think that, at a minimum, section 504 requires accommodations of the type contained in Delta's tariff.

In short, Delta has failed to show that its policy of requiring signatures on medical release forms from all handicapped persons, and only from handicapped persons, was reasonably related to a legitimate purpose. Handicapped persons cannot be assumed to be more likely to have medical problems during a flight. And although nonambulatory persons can be expected to require more assistance during a flight than ambulatory persons, both the tariffs and the Rehabilitation Act require Delta, within limits not applicable here, to provide that assistance. We therefore find Delta's policy of requiring all handicapped persons, and only handicapped persons, to sign

---

**4.** Even if the handicapped person has failed to make a reservation 24 hours in advance, Delta

· must "make every reasonable effort to accommodate" him. Rule 35(H) exception 2(a)(i)(aa).

medical release forms discriminatory as a matter of law.

## II. *The Rehabilitation Act Claim.*

Plaintiff seeks attorney's fees under 29 U.S.C. § 794a(b) (1982), which expressly authorizes courts to award the prevailing party, other than the United States, in any action or proceeding under the Rehabilitation Act a reasonable attorney's fee as part of the costs. The Federal Aviation Act contains no comparable provision, and plaintiff does not argue that that Act authorizes awards of attorney's fees as part of the costs, either by way of incorporation of section 749a(b) or otherwise. Thus, although we have applied section 504's nondiscrimination provision because of its conceded incorporation into section 404(b) of the Federal Aviation Act, in order to determine whether the district court may award the plaintiff attorney's fees as part of the costs we must decide whether the Rehabilitation Act applies to Delta of its own force.[5]

■ Section 504 of the Rehabilitation Act prohibits discrimination "under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794 (1982). To determine that Delta's discriminatory policy is proscribed by the Rehabilitation Act as well as by the Federal Aviation Act, we would be required to answer two questions affirmatively: first, does Delta receive Federal financial assistance?; second, if so, did the discrimination occur "under [the] program or activity" receiving the federal financial assistance? We hold that Delta's policy did not occur under a program or activity receiving federal financial assistance. Thus, section 504 is inapplicable and plaintiff may not recover attorney's fees as part of the costs in this action.

Plaintiff argues that Delta receives three types of federal financial assistance: (a) payments for the carriage of mail under

section 406 of the Federal Aviation Act, 49 U.S.C. § 1376 (1976); (b) payments for providing service to a small community under section 419 of the Federal Aviation Act, 49 U.S.C. § 1389 (1976); and (c) a variety of indirect forms of federal financial assistance. We shall consider each in turn.

### A. *Mail subsidies.*

Plaintiff argues that the payments Delta receives for the carriage of mail constitute federal financial assistance. He points out that in fixing the air-mail rates, the Civil Aeronautics Board (CAB) must "take into consideration ... the need of each ... carrier for compensation ... sufficient ..., together with all other revenue of the air carrier, to enable such air carrier ... to maintain and continue the development" of a national air-transportation system. 49 U.S.C. § 1376(b) (1976). He also cites a number of cases referring to payments under section 406 as "subsidies." *See Delta Air Lines v. Summerfield*, 347 U.S. 74, 74 S.Ct. 350, 98 L.Ed. 513 (1954); *Delta Air Lines, Inc. v. CAB*, 280 F.2d 636, 638 (D.C. Cir.1960); *American Overseas Airlines v. CAB*, 254 F.2d 744, 749 (D.C.Cir.1958). He argues that the statutes and the cases thus make it clear that payments for the carriage of mail constitute federal financial assistance within the meaning of the Rehabilitation Act.

Delta alleges that the payments it receives simply compensate it for services rendered. It refers to the affidavit of its accountant indicating that at the time the discrimination occurred Delta was actually losing money carrying mail. When the amounts received for performing services for the government fall below the market value of the services rendered, Delta argues, the payments cannot be considered federal financial assistance.

■ Although there is some merit to each argument, neither, we think, states

---

**5.** Although plaintiff cannot recover attorney's fees as part of his costs without prevailing on a claim under the Rehabilitation Act, we note that courts have found it appropriate in assessing punitive damages in suits under section 1374(b)

of the Federal Aviation Act to consider the amount of attorney fees incurred by the prevailing plaintiff. *See Nader v. Allegheny Airlines, Inc.,* 445 F.Supp. 168 (D.D.C.1978), *reversed on other grounds,* 626 F.2d 1031 (D.C.Cir.1980).

the correct rule. We agree with plaintiff that payments for the carriage of mail under section 406 may constitute federal financial assistance subjecting the recipient to the proscriptions of the Rehabilitation Act. The statute and the cases make it plain that Congress authorized the Board to consider the carrier's need for a subsidy in setting the air mail rates. *See American Airlines, Inc. v. CAB*, 495 F.2d 1010, 1022 (D.C.Cir.1974). We have no doubt that payments that include a subsidy constitute "Federal financial assistance" within the meaning of the Rehabilitation Act.

Plaintiff errs, however, when he suggests that all payments under section 406 include subsidies. We cannot conclude that a carrier's air-mail rate includes a subsidy simply because the Board must, in setting the rates, consider the carrier's need for a subsidy. If the Board determines that a carrier does not need a subsidy, that carrier's air-mail rate will presumably not include a subsidy. The cases plaintiff cites stand for the proposition that section 406 payments may include subsidies; they do not establish that such payments always include subsidies.

Delta argues that the payments it receives under section 406 are not federal financial assistance because they simply compensate it for services rendered. There is a great deal of support for Delta's argument that purely compensatory payments do not constitute federal financial assistance. The Department of Health, Education and Welfare, the agency charged by the Executive with coordinating the issuance of regulations under the Rehabilitation Act, *see* Exec.Order No. 11914, 41 Fed. Reg. 17871 (1976), has interpreted the term "Federal financial assistance" not to include government procurement contracts— i.e., contracts in which goods or services are sold or purchased by the government at fair market value. 45 C.F.R. § 84.3(h) (1983). By contrast, it does include among the forms of federal assistance transfers or leases of government property at less than fair market value or for reduced consideration. 45 C.F.R. § 84.3(h)(3)(i) (1983). Under the HEW's regulations, therefore, a party is receiving Federal financial assistance only if it is benefiting in its dealings with the government to a greater extent than if it were dealing with another party.

■ The relevant legislative history leaves no doubt that the HEW's definition of federal financial assistance as not including procurement contracts is correct. The legislative history of the Rehabilitation Act and its subsequent amendments is unilluminating except insofar as it indicates that those terms were to be given the same meaning as the same terms in section 601 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d–1 (1982) (Title VI), and section 901 of the Education Amendments of 1972, 20 U.S.C. § 1683 (1982) (Title IX). *See* S.Rep. No. 1297, 93d Cong., 2d Sess. 39–40 (Nov. 26, 1974), *reprinted in* 1974 U.S.Code Cong. & Ad.News 6373, 6390. The drafters of Title VI, however, made it clear that that statute was not intended to apply to government procurement contracts. *See* Letter from Nicholas deB. Katzenbach, Deputy Attorney General, to Hon. Emanuel Celler, Chairman, Committee on the Judiciary, House of Representatives (December 2, 1963), *reprinted in* 110 Cong.Rec. 13380 (1964); Letter from Robert Kennedy, Attorney General, to Hon. John Sherman Cooper (April 29, 1964), *reprinted in* 110 Cong. Rec. 10075, 10076 (1964).

The authorities cited by plaintiff are not to the contrary. Besides the cases discussed above, plaintiff cites the CAB's definition of "Federal financial assistance" in its regulation implementing Title VI. 14 C.F.R. § 379.12(b) (1984). That section states that "[t]he term 'Federal financial assistance' includes grants of Federal funds under section 406 or 419 of the Federal Aviation Act." But, as noted above, payments under section 406 may or may not exceed compensatory levels. If they do not, they would not appear to be "grants" of federal funds within the meaning of the regulation. In any event, insofar as purely compensatory payments were included within the CAB's definition of "Federal fi-

nancial assistance," the regulation would be inconsistent with Congress' intent.

It is thus clear that payments under section 406 constitute federal financial assistance if they include a subsidy but that they do not constitute such assistance if they are merely compensatory. Delta suggests that whether or not a carrier is subject to the Rehabilitation Act should turn on whether or not the carrier's rate exceeds the fair market value of the services rendered. Such a test is supported by the HEW regulation discussed above. *See* 45 C.F.R. § 84.3 (1983). However, application of such a test would involve serious practical problems for the courts and would lead to incongruous results. First, fair market value by its very nature is constantly changing. Under Delta's test, the question whether a carrier falls within or without the purview of the Rehabilitation Act would turn on the vicissitudes of the market. A carrier's status might change from moment to moment. Moreover, under Delta's test anyone who has negotiated a favorable procurement contract with the government would find himself subject to the Act. Finally, courts are not particularly well-equipped to interpret the complex economic evidence that they would have to consider to make findings concerning fair market value. Highly divergent holdings on which programs are subject to the civil rights laws could thus be expected. Consequently, predictability and consistency in the application of the civil rights laws would be compromised if we adopted the test Delta suggests.

We think that in determining which programs are subject to the civil rights laws courts should focus not on market value but on the intention of the government. Courts should determine whether the government intended to provide assistance or merely to compensate. The relevant intention is that of Congress or that of the administrative agency to which Congress has delegated the power to determine whether assistance should be provided. In short, the question of which programs are subject to the civil rights laws is a question of law, to be answered in most cases by reference to the statutory authority for the particular disbursements at issue or, if the authority to provide assistance has been delegated, to the relevant administrative documents.

▬▬▬ As we have seen, Congress delegated to the CAB the authority to determine which air carriers should receive a section 406 subsidy. *See supra* at 1208–1209. In light of that delegation, we think that the CAB's views on which carriers do and which carriers do not receive subsidies will ordinarily be conclusive.[6] The CAB periodically publishes a chart listing all carriers under its jurisdiction and indicating whether or not each such carrier receives a section 406 subsidy. *See* 14 C.F.R. Part 241, § 04 (1984); 47 Fed.Reg. 32915, 32917–32918 (1982). The chart for the relevant period indicates that Delta was not receiving such a subsidy at the time the discrimination against plaintiff occurred. *See* 14 C.F.R. Part 241, § 04 (1982); 14 C.F.R. Part 241, § 04 (1979). We find the CAB's determination dispositive of the question before us.

B. *Payments for Small Community Service.*

▬▬▬ Plaintiff also argues that payments received by Delta pursuant to section 419 of the Aviation Act constitute "Federal financial assistance." 49 U.S.C. § 1389 (1976). Section 419 authorizes the CAB to pay airlines money for providing air service to small communities if the CAB deems the service essential and if the service would not otherwise be provided. We hold that Delta's receipt of such payments at most subjects only the small community service program to the civil rights laws.

---

**6.** We need not consider whether, or under what circumstances, an air carrier may challenge its misclassification by the CAB as a recipient of a section 406 subsidy. Nor need we decide whether a private person may challenge a classification made in bad faith or in order to evade the civil rights laws.

Plaintiff points to legislative history indicating that Congress considered the small community service program a "subsidy program." *See* H.R.Rep. No. 1211, 95th Cong., 2d Sess. 25–26, *reprinted in* 1978 U.S.Code Cong. & Ad.News 3737, 3761. Delta points to the portions of the legislative history in which Congress refers to section 419 payments as "compensation." *See id.* We need not decide, however, whether the receipt of section 419 payments may under some circumstances subject an air carrier to the Rehabilitation Act. As we noted earlier, the Rehabilitation Act, like Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972, *see supra* at 15–16, applies only to "*programs* receiving Federal financial assistance." 29 U.S.C. § 794 (1982) (emphasis added). The Supreme Court has repeatedly emphasized that those statutes are program-specific in reach—that they prohibit discrimination only in the particular program receiving the federal financial assistance. *See, e.g., Consolidated Rail Corp. v. Darrone,* —— U.S. ——, 104 S.Ct. 1248, 1255, 79 L.Ed.2d 568 (1984); *See generally* Note, *The Program-Specific Reach of Title IX,* 83 Colum.L.Rev. 1210 (1983). Although the definition of the term "program" is as yet unsettled, *see Darrone,* 104 S.Ct. at 1255, we are confident that the "program" here is the small community service program. First, the House Report refers to the section 419 program as the "small community service program." *See* H.R.Rep. No. 1211, 95th Cong., 2d Sess. 26, *reprinted in* 1978 U.S.Code Cong. & Ad. News 3737, 3762. Second, insofar as the federal payments assist the air carrier, they assist it only to the extent necessary to carry on the small community service program.

 Delta's discrimination against plaintiff occurred in connection with a flight from Birmingham, Alabama, to Los Angeles, California. Because it did not occur in connection with the small community service program, it did not occur in a "program or activity receiving Federal financial assistance" under section 419 of the Federal Aviation Act.

## C. *Indirect Federal Assistance.*

Plaintiff also argues that Delta receives various forms of indirect federal assistance. He cites the licensing certification services provided by the Federal Aeronautics Administration (FAA) for pilots and aircraft; the distribution of weather information needed by pilots; the construction, operation, and maintenance of navigational and air traffic control facilities and equipment; the provision of air traffic control services; and grants to airports.

Delta maintains that none of the foregoing forms of assistance subjects Delta to the Rehabilitation Act. Delta argues that the district court properly relied on *Angel v. Pan American World Airways, Inc.,* 519 F.Supp. 1173 (D.D.C.1981), in which the court rejected an argument similar to plaintiff's. The *Angel* court stated that "[t]o hold that commercial airlines fall within section 504 merely because of assistance provided to airports would expand improperly the accepted proposition that Section 504 is limited to direct recipients of federal funds." *Id.* at 1178 (citations omitted). We note that the CAB has used the same reasoning in concluding that "air traffic control services and other programs are not financial assistance to airlines." *Nondiscrimination on the Basis of Handicap,* 47 Fed.Reg. 25936, 25937 (1982). Because the view of the *Angel* court and of the CAB is based on an erroneous premise, we reject it.

The *Angel* court and the CAB both relied on the "accepted proposition that section 504 is limited to direct recipients of Federal funds." Last term, however, the Supreme Court unanimously held that section 901(a) of Title IX of the Education Amendments of 1972, Pub.L. No. 92–318, 86 Stat. 373, 20 U.S.C. § 1681(a), which prohibits sex discrimination in "any education program or activity receiving Federal financial assistance," 20 U.S.C. § 1681(a) (1982), applies to programs receiving assistance indirectly. *Grove City College v. Bell,* —— U.S. ——, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984). Not-

ing that "[t]he economic effect of direct and indirect assistance often is indistinguishable," 104 S.Ct. at 1217, the Court had "little trouble concluding that Title IX coverage is not foreclosed because federal funds are granted to [a College's] students rather than directly to one of the College's educational programs." *Id.* at 1220.

■ As we noted above, Congress intended that the terms "program or activity receiving Federal financial assistance" in the Rehabilitation Act be given the same interpretation as the identical language in Title IX. *See supra* at 1209. The Supreme Court has treated this language in Title IX as coextensive with the language in the Rehabilitation Act. *See Consolidated Rail Corp. v. Darrone,* ——— U.S. ———, 104 S.Ct. 1248, 1255, 79 L.Ed.2d 568 (1984).[7] We think the Court's holding in *Grove City* is thus fully applicable here. Accordingly, we cannot conclude that Delta is beyond the scope of the Rehabilitation Act simply because the assistance plaintiff alleges it receives from the federal government is indirect. We shall therefore proceed to consider whether the forms of assistance in question subject Delta to the Rehabilitation Act.

1. *Licensing Certification.* Although we have not yet had an opportunity to consider the question whether the grant of a license constitutes federal financial assistance, the District of Columbia Circuit has done so in a context similar to this one. In *Gottfried v. Federal Communications Commission,* 655 F.2d 297 (D.C.Cir.1981), it decided that the receipt of a broadcasting license from the Federal Communications Commission (FCC) does not render a commercial broadcaster a recipient of federal financial assistance for purposes of the Rehabilitation Act. The court noted that broadcast licenses are commodities of great value, 655 F.2d at 312, but it concluded that Congress did not intend broadcast licenses

to count as federal financial assistance. *Id.* at 312–14.

■ We find the District of Columbia Circuit's reasoning persuasive and apply it here. The *Gottfried* court examined the pre- and post-enactment history of Title VI, on which, as we have already noted, the Rehabilitation Act was modeled. *See supra* at 1209. The congressional hearings and floor debates on Title VI included a great deal of discussion of that statute's sweep, *see Gottfried,* 655 F.2d at 313. There was apparently no reference to federal licenses in any such discussion. *Id.* The *Gottfried* court also noted that a list prepared by Deputy Attorney General Katzenbach at Congressman Celler's request enumerating federal programs and activities that would fall within the ambit of Title VI "included no reference to the FCC or to any other government program involving issuance of federal licenses." *Id.* *See* 110 Cong.Rec. 13381–82 (1964). We note that, in a letter accompanying the list, Deputy Attorney General Katzenbach stated that the list was not "satisfactorily representative of the amounts of Federal financial assistance which potentially could be affected by the provisions of Title VI." Letter from Deputy Attorney General Nicholas deB. Katzenbach to Congressman Emanuel Celler, Dec. 2, 1963, *reprinted in* 110 Cong.Rec. 13380 (1964). The list is therefore of little value in determining whether particular federal activities may subject particular programs to the civil rights laws. We do think, however, that the absence of any reference in the list to federal licenses of any kind suggests that licenses were not considered Federal financial assistance.

■ The *Gottfried* court also discussed the post-enactment interpretations of the Civil Rights Act by the Justice Department, the agency designated to develop interpreting regulations. Although all affected agencies were required to formulate

---

**7.** Title IX, of course, applies only to "education program[s] or activit[ies] receiving Federal financial assistance." 20 U.S.C. § 1681(a) (1982). Because of the presence of the term "education,"

Title IX is actually narrower in scope than the Rehabilitation Act. But the two statutes have been treated as otherwise coextensive. *See Darrone, supra.*

standards to implement Title VI, the Justice Department never found a need for the issuance of regulations by the FCC. *See Gottfried*, 655 F.2d at 313. In addition, the Justice Department has specifically stated that "the term 'Federal financial assistance' ... does not include licenses...." *See Nondiscrimination Based on Handicap in Federally Assisted Programs—Implementation of Section 504 of the Rehabilitation Act of 1973 and Executive Order 11914*, 45 Fed.Reg. 37620, 37632 (1980). Both the pre- and post-enactment history of Title VI thus support the *Gottfried* court's conclusion. Plaintiff has presented no evidence indicating a conflicting legislative intent. We therefore adopt the view of the District of Columbia Circuit and hold that federal licenses do not constitute Federal financial assistance within the meaning of the Rehabilitation Act.

2. *Airport grants, weather services, and air traffic control services.* Delta argues that it cannot be subject to the Rehabilitation Act simply because it benefits from federal grants to airports and from federal provision of weather and air traffic control services. It argues that those grants and services are intended to benefit the public generally. A contrary holding, Delta argues, would subject *everyone* to the civil rights laws. We note that the CAB, agreeing with Delta, has found that such services are not financial assistance to airlines because "they are services provided to the public generally to ensure flight safety." *See Nondiscrimination on the Basis of Handicap*, 47 Fed.Reg. 25936, 25937 (1982).

Plaintiff does not dispute that the acceptance of services provided to the public generally ordinarily does not make a person a recipient of federal financial assistance for purposes of the civil rights laws. Rather, he argues that Delta is subject to the Act because it benefits from the federal grants and services he enumerates to a substantially greater degree than does the general public. To support his argument, he attached as an exhibit to one of his district court briefs several charts prepared by the FAA. Those charts indicate the degree to which the FAA believes the services plaintiff enumerates are incurred on behalf of the general public, air carriers, and general aviation, respectively. Each chart indicates that at least half of the costs are incurred on behalf of the air carriers.

▪ We need not decide whether a person can become subject to the Rehabilitation Act by benefiting to a substantially greater degree than the general public from services provided primarily for the general public. We find that even though air carriers benefit from federal airport grants and federal air traffic control and weather services to a greater degree than the general public, they also pay for those services, as Congress intended them to, to a greater degree than the general public does. For that reason, those services do not constitute "Federal financial assistance" to air carriers.

As part of the Airport and Airway Revenue Act of 1970, Pub.L. No. 91–258, 84 Stat. 219 (codified in scattered sections of Titles 26, 49, and 50), Congress established the Airport and Airway Trust Fund. 49 U.S.C. § 1742 (1976) *repealed by* Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. No. 97–248, Title II, § 281(b), 96 Stat. 324, 566.[8] It is from the Airport and Airway Trust Fund that a substantial part of the funding for the services plaintiff

8. In the Airport and Airway Revenue Act of 1970, Congress authorized the appropriation of funds for the Airport and Airway Trust Fund through July 1, 1980. The discrimination against plaintiff occurred on March 1, 1980. The regime established in the 1970 act is therefore applicable to this case. The provisions of the 1970 act concerning the Airport and Airway Trust Fund were repealed by Congress in 1982. Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. No. 97–248, Title II, § 281(b), 96 Stat. 324, 566. However, Congress at that time "created" another Airport and Airway Trust Fund. *Id.* at § 281(a), 96 Stat. 324, 565–66. The provisions of the 1982 act regarding the Trust Fund are in most respects identical to those of the 1970 act. *Id.* Therefore, even though the laws applicable in 1980 have been repealed, we refer to the Airport and Airway Trust Fund throughout the opinion in the present tense. We have also omitted further citations to the repealing legislation.

sets forth as "Federal financial assistance" come. *See* 49 U.S.C. § 1742(f)(1) (1976). The Airport and Airway Trust Fund is composed largely of appropriations equivalent to amounts received from taxes on aviation fuel, taxes on transportation by air and on use of civil aircraft, taxes on gasoline used in aircraft, and taxes on tires and tubes used on aircraft. 49 U.S.C. § 1742(b) (1976). The Act also authorizes appropriation of such additional sums from the general fund of the treasury as may be required to pay for the services plaintiff discusses. 49 U.S.C. § 1742(d) (1976). It is clear from the Act that Congress contemplated a regime whereby the users of the services plaintiff enumerates would pay for a larger share of those services than the general public.

The legislative history of the Airport and Airway Revenue Act confirms that Congress established this regime in order to allocate the costs of the federal airport services among the beneficiaries of the services. The House Report accompanying the bill, for instance, states that "[t]he Ways and Means Committee agreed that the users of the Federal aviation system should properly pay for a greater share of the costs than at present, and that the goal should be for the civil part of the system to eventually become self-sustaining from the air user taxes." House Report No. 601, 91st Cong., 1st Sess. at 38, *reprinted in* 1970 U.S.Code Cong. & Ad.News 3047, 3083–84. Other statements in the legislative history reveal a similar intention. *See, e.g., id.* at 41, *reprinted in* U.S.Code Cong. & Ad.News at 3086 ("The Ways and Means Committee has directed the Department of Transportation to conduct a study and investigation to make available to the Congress information on the adequacy of the air user taxes in this title in order to insure an equitable distribution of future tax burdens among the various categories of airport and airway users as well as other persons deriving benefits from the aviation system."). Those statements convince us that Congress did not consider the services

that plaintiff enumerates "Federal financial assistance" to air carriers.

The page that plaintiff attached as an exhibit to his district court brief updates a report prepared by the FAA pursuant to section 209 of the Airport and Airway Revenue Act of 1970, Pub.L. No. 91–258, § 209, 84 Stat. 219, 252–53. Rodgers, *Financing the Airport and Airway System: Cost Allocating and Recovery* (1978) (Report No. FAA–AVP–78–14, available through the National Technical Information Services, Springfield, Virginia). Section 209 required the Secretary of Transportation

> to make a study and investigation to make available to the Congress information on the basis of which it may determine what revisions, if any, of the taxes imposed by the United States should be made in order to assure, insofar as practicable, an equitable distribution of the tax burden among the various classes of persons using the airports and airways of the United States or otherwise deriving benefits from such airports and airways.

Pub.L. No. 91–258, § 209(a), 84 Stat. 219, 252–53 (1970). The 1978 report indicated that the tax burdens were not being distributed equitably—users of the airport and airway system were not contributing to the Trust Fund to the same extent that they were benefiting from federal services. Rodgers, *supra,* at 10, 39–47. It also indicated that sums from the general tax fund still comprised a significant portion of the Trust Fund. *Id.* at 10, 11, 41. Neither observation, however, affects our conclusion that these services are not federal financial assistance.

We deem it irrelevant that monies from the general tax fund were still being utilized: Congress might reasonably have concluded that the services provided by the FAA confer benefits on the general public over and above the benefits they confer on the users of the system. We also think it unimportant that at any particular moment the tax burdens were not perfectly allocat-

ed among the beneficiaries. As we have said, Congress has designed a *system* whereby the beneficiaries of the services provided by the FAA would bear the burden of their costs. The fact that the costs and benefits were imperfectly allocated at any one point does not change the nature of that system. In fact, the FAA report in question was part of the mechanism Congress designed to ensure that over a period of time an equitable distribution would occur. As we said regarding air-mail rates, whether services constitute federal financial assistance should turn primarily on Congress' intent, not on whether the congressionally mandated system is operating flawlessly or whether accountants' studies demonstrate that changes in allocation formulas are required.[9] Congress' intention here was plainly that the users of the airport and airway system would pay for these services to the extent they benefited from them. That, we think, suffices to establish that Congress did not consider these services "assistance" to air carriers and that the receipt of these services does not subject air carriers to the Rehabilitation Act.

## CONCLUSION

By requiring the handicapped plaintiff to sign a medical release form before boarding, Delta violated section 1374(b) of the Federal Aviation Act as a matter of law. Plaintiff's Rehabilitation Act claim, however, was properly dismissed on the ground that the discrimination did not occur under a "program or activity receiving Federal financial assistance." We remand this case to the district court for determination of what relief, other than an award of attorney's fees as part of the costs, might be appropriate.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.

[9]. We also note that, unlike the views of the CAB regarding section 406 subsidies, *see supra* at 4102, the views of the FAA need not be given particular weight here. Congress did not delegate to the FAA the authority to allocate costs and benefits. It simply required the FAA to study the problem and make suggestions.