[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 22, 2005
THOMAS K. KAHN
CLERK

No. 04-13464

D. C. Docket No. 04-20372-CV-UUB

FREDERICK SHOTZ,
DANIELLE BLACK, et al,

                                        Plaintiffs-Appellants,

versus

AMERICAN AIRLINES, INC.,
a Delaware corporation, UNITED AIR
LINES, INC., a Delaware corporation, et al.,

                                        Defendants-Appellees.

Appeal from the United States District Court
for the Southern District of Florida

**(August 22, 2005)**

Before DUBINA and WILSON, Circuit Judges, and LAWSON\*, District Judge.

_____

\*Honorable Hugh Lawson, United States District Judge for the Middle District of Georgia,
sitting by designation.

DUBINA, Circuit Judge:

The plaintiffs, a potential class of disabled persons, filed this putative class action against ten airline carriers for alleged violations of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, and sought damages, declaratory and injunctive relief, and attorney's fees and costs. The district court granted the defendants' Motion to Dismiss for lack of subject matter jurisdiction, holding that the defendant airline carriers cannot be sued under the Rehabilitation Act because the funds and financial benefits that Congress provided to the airline industry in response to the September 11 terrorist acts did not constitute "'federal financial assistance' within the meaning of the Rehabilitation Act." *Shotz v. American Airlines,* 323 F. Supp. 2d 1315, 1319 (S.D. Fla. 2004). The plaintiffs appeal, and, for the reasons that follow, we affirm the district court's order.

## I. BACKGROUND

The potential class consists of disabled persons whom the defendant airline carriers allegedly discriminated against on the basis of their disabilities. The gravamen of the plaintiffs' amended complaint is that the airline carriers "failed to implement system wide policies and practices that would make their facilities and services accessible to people with disabilities," in violation of the Rehabilitation

Act.  The Rehabilitation Act provides in pertinent part:  "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).  The plaintiffs contend that the massive aid package, titled the Air Transportation Safety and System Stabilization Act, Pub. L. No. 107-42, 115 Stat. 230 (2001) ("Stabilization Act"), that Congress provided to the airline industry in response to the September 11 terrorist acts qualified as "federal financial assistance," thereby subjecting the airline carriers to the Rehabilitation Act.  The district court disagreed and dismissed the case for lack of subject matter jurisdiction.  *Shotz*, 323 F. Supp. 2d at 1318-20.  The plaintiffs then perfected this appeal.

## II.  ISSUE

Whether the district court properly concluded that it lacked subject matter jurisdiction because it found the Rehabilitation Act was inapplicable to the plaintiffs' claims.

## III.  STANDARD OF REVIEW

"In reviewing an order granting a motion to dismiss, the appellate court must accept the factual allegations of the complaint as true and may affirm the

dismissal of the complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Mesocap Ind. Ltd. v. Torm Lines*, 194 F.3d 1342, 1343 (11th Cir. 1999) (quotation omitted).

## IV.  DISCUSSION

The Rehabilitation Act does not define "federal financial assistance." Courts, however, have defined the term as used in the Rehabilitation Act to mean the federal government's provision of a subsidy to an entity. *DeVargas v. Mason & Hanger-Silas Mason Co.,* 911 F.2d 1377, 1382 (10th Cir. 1990) (finding that a defendant receives "federal financial assistance" within meaning of Rehabilitation Act when it receives a subsidy) (citing *Jacobson v. Delta Airlines, Inc.*, 742 F.2d 1202, 1208-09 (9th Cir. 1984)); *see also Bachman v. Am. Soc.'y of Clinical Pathologists*, 577 F. Supp. 1257, 1264 (D.N.J. 1983) ("The term 'assistance' connotes a transfer of government funds by way of subsidy."). Generally, "to determine the applicability of [the Rehabilitation Act], [a court] must determine whether the government intended to give [the defendant] a subsidy," as opposed to compensation. *DeVargas*, 911 F.2d at 1382; *accord Delmonte v. Dep't of Bus. and Prof'l Regulation*, 877 F. Supp. 1563, 1565 (S.D. Fla. 1995).

The defendants assert that the Stabilization Act was not a subsidy, but rather compensation provided to the airline industry in response to the economic crisis

4

the industry faced as a result of the September 11 terrorist attacks. In support of their argument, defendants point to Congress's use of the word "compensate" in the Stabilization Act:

> (a) IN GENERAL.– Notwithstanding any other provision of law, the President shall take the following actions to *compensate* air carriers for losses incurred by the air carriers as a result of the terrorist attacks on the United States that occurred on September 11, 2001:
>
>  . . .
>
> (2) *Compensate* air carriers in an aggregate amount equal to $5,000,000,000 for–
>
> (A) direct losses incurred beginning on September 11, 2001, by air carriers as a result of any Federal ground stop order issued by the Secretary of Transportation or any subsequent order which continues or renews such a stoppage; and
>
> (B) the incremental losses incurred beginning September 11, 2001, and ending December 31, 2001, by air carriers as a direct result of such attacks.

Pub. L. No. 107-42, 115 Stat. 230 (2001) (emphases added). The defendants also find support for their argument in other federal regulations implementing the Stabilization Act: for example, Title 14 of the Code of Federal Regulations, part 330, which lays out certain procedures for implementing § 101(a)(2) of the Stabilization Act, is titled "Procedures for Compensation of Air Carriers;" 14 C.F.R. § 330.1 reads in pertinent part: "This statutory provision is intended to compensate air carriers for direct losses incurred as a result of the Federal ground stop order issued by the Secretary of Transportation;"14 C.F.R. § 330.9 details "the limits on compensation to air carriers;" and 14 C.F.R. § 330.11 states "[w]hich carriers are eligible to apply for compensation." The district court agreed with the defendants, finding that the language in the Stabilization Act, and the above implementing regulations, unambiguously show Congress intended to compensate, not subsidize, airline carriers.

The plaintiffs concede, for purposes of argument, that the funds and financial benefits provided to the defendants under § 101(a)(2)(A) are not a subsidy. They maintain, however, that the funds and financial benefits provided under § 101(a)(2)(B) are a subsidy because they went far beyond compensating actual or potential losses sustained by airline carriers as a result of the September 11 terrorist attacks.

The plaintiffs' argument, however, misses the mark. Although the plaintiffs are correct in arguing that "federal financial assistance" as used in the Rehabilitation Act should be interpreted broadly, *see Arline v. Sch. Bd. of Nassau County*, 772 F.2d 759, 762 n.9 (11th Cir. 1985), the pertinent inquiry here is Congress's intent in passing the Stabilization Act. We must look to the Act itself to determine whether Congress intended to compensate or provide a subsidy. *See Delmonte*, 877 F. Supp. at 1565; *see also Harry v. Marchant*, 291 F.3d 767, 770 (11th Cir. 2002) ("[W]e begin by examining the text of the statute to determine whether its meaning is clear."). In addition, we agree with the *Delmonte* court that "the question really is whether Congress intended for this type of assistance to trigger the coverage of § 504." *Delmonte*, 877 F. Supp. at 1565 (recognizing that regardless of whether financial benefits received by an entity appeared "on its face" to be a form of "federal financial assistance" within the meaning of the Rehabilitation Act, the court must determine whether Congress intended for the recipient of such financial benefits to be subject to the Rehabilitation Act). Plainly, the express language found in the Stabilization Act unambiguously shows Congress intended for the funds and financial benefits at issue to compensate, not subsidize, airline carriers. Indeed, the Stabilization Act begins by stating "the President shall take the following actions to *compensate* air carriers for losses

7

incurred by the air carriers as a result of the terrorist attacks on the United States that occurred on September 11, 2001." Pub. L. No. 107-42, 115 Stat. 230 (emphasis added). Accordingly, upon "find[ing] the terms of a statute unambiguous, judicial inquiry is complete." *Burlington N. R.R. Co. v. Oklahoma Tax Comm'n*, 481 U.S. 454, 461, 107 S. Ct. 1855, 1860 (1987) (quoting *Rubin v. United States,* 449 U.S. 424, 430, 101 S. Ct. 698, 701 (1981)); *See, e.g., Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54, 112 S. Ct. 1146, 1149 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."). Further, we cannot ignore the unique circumstances under which Congress passed this legislation. In this regard, it seems illogical to infer that, in passing the Stabilization Act in response to the enormous economic crisis the airline industry faced as a result of the September 11 terrorist acts, Congress also intended to expose airline carriers to additional economic risk by allowing private lawsuits for damages to be brought under the Rehabilitation Act.

Additionally, our conclusion that Congress clearly did not intend for the Rehabilitation Act to apply to airline carriers is further buttressed by the very existence of the Air Carrier Access Act passed in 1986 ("ACAA"), 49 U.S.C. § 41705 *et seq.* Congress passed the ACAA in response to the Supreme Court's

8

ruling in *Dep't of Transp. v. Paralyzed Veterans of America*, 477 U.S. 597, 610-12, 106 S. Ct. 2705, 2713-14 (1986), in which the Court held that certain forms of federal funding provided to airport operators and to air traffic control systems did not subject airline carriers to the Rehabilitation Act because they were not direct recipients of the funds.[1]  The ACAA not only specifically addresses and prohibits airline discrimination based on disabilities, it provides various remedies and enforcement mechanisms (e.g., civil penalties, enforcement actions brought by the Department of Transportation ("DOT") upon complaints, and, in certain instances, the opportunity for review in the D.C. circuit regarding DOT orders promulgated under the ACAA).  49 U.S.C. § 41705 *et seq.*; *see also Love v. Delta Airlines*, 310 F.3d 1347, 1354-58 (11th Cir. 2002) (finding that Congress "create[d] an elaborate and comprehensive enforcement scheme" to prohibit discrimination by airline

---

[1] The plaintiffs' reliance on *Paralyzed Veterans* is misplaced.  Simply because the defendant airline carriers are direct recipients of funds and financial benefits provided through the Stabilization Act does not mean that such aid is automatically "federal financial assistance" within the meaning of the Rehabilitation Act.  Rather, as detailed herein, the relevant inquiry is whether Congress intended for such aid to constitute a subsidy and subject the recipients to the provisions of the Rehabilitation Act.  *Delmonte*, 877 F. Supp. at 1565.  In *Paralyzed Veterans*, there was no dispute over, or discussion on, whether Congress intended for the federal funding at issue, provided through grants pursuant to the Airport and Airway Development Act of 1970, to constitute "federal financial assistance" within the meaning of the Rehabilitation Act.  Similarly, in *Flores v. Puerto Rico Telephone Co.*, 840 F. Supp. 3, 4 (D.P.R. 1993), *rev'd on other grounds*, 64 F.3d 742 (1st Cir. 1995), another case heavily relied upon by the plaintiffs, there was no dispute over, or discussion on, whether Congress intended for the funds at issue, provided through the Federal Emergency Management Agency, to constitute "federal financial aid" within the meaning of the Rehabilitation Act.

carriers on the basis of disability). To accept plaintiffs' contention here, one would have to believe that Congress intended, in the wake of the September 11 terrorist acts, to undermine the ACAA by providing a separate and distinct method for addressing an airline carrier's discrimination on the basis of disability, one that allows for an individual to bring a private lawsuit in a district court–something not available under the ACAA. 49 U.S.C. § 41705 *et seq.*; *see also Love,* 310 F.3d at 1359-60 (11th Cir. 2002) (holding that there is no implied private right of action to sue under the ACAA in federal district court). We decline to accept plaintiffs' arguments.

Importantly, Congress usually requires federal agencies to obtain from the recipients of "federal financial aid" written, executed assurances that they will comply with the Rehabilitation Act. *See generally* 49 C.F.R. § 27.9(a). Indisputably, such implementing assurances were not promulgated here. In fact, the DOT, the agency charged with implementing the Stabilization Act, has filed an amicus curiae brief on behalf of the defendant airline carriers stating that it "did not require assurances prior to disbursing the funds due under the Stabilization Act," because it did not believe the funds were "federal financial assistance" within the meaning of the Rehabilitation Act. As the implementing agency of the Stabilization Act, the DOT's interpretation of the Stabilization Act warrants

deference from this court. *Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 844, 104 S. Ct. 2778, 2782 (1984) ("We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations.").

The plaintiffs counter by claiming such assurances were not promulgated because no member of Congress wanted to be accused of stalling such important September 11-related legislation. Besides offering no evidence of this, a far more logical and plausible inference is that, in passing the Stabilization Act, Congress did not intend the Rehabilitation Act to apply to airline carriers.

In an effort to show that the Stabilization Act provided the airline industry with a subsidy, the plaintiffs point us to some of the defendants' descriptions of the funds and financial benefits they received through the Stabilization Act found in their various SEC filings or 10-k's, wherein the defendants use descriptions such as "grants" or "assistance." This argument is unavailing. As previously noted, the relevant inquiry is Congress's intent in passing the Stabilization Act, *see, e.g.*, *DeVargas*, 911 F.2d at 1382, not how the defendant airline carriers described or handled the funds and financial benefits they received. *See, e.g., Delmonte*, 877 F. Supp. at 1565.

The plaintiffs also assert that, under *Jarno v. Lewis,* 256 F. Supp. 2d 499 (E.D. Va. 2003), and other similar cases, payments or financial benefits received by private entities from the federal government can *only* constitute "compensation" if the subject entity provided or rendered services to the federal government in exchange. The plaintiffs have, however, misstated the holdings of these cases. These cases simply found that "payments for services rendered qualified as compensation." *Shotz,* 323 F. Supp. 2d at 1319. Moreover, as the district court aptly noted, "whether [d]efendants performed services in this case in exchange for funds they received is irrelevant [because] the inquiry of whether Defendants received 'federal financial assistance' . . . focuses on the intent of Congress when enacting the Stabilization Act, and not on the acts of the recipient of the funds." *Id.*

The plaintiffs further contend that because the Stabilization Act contains the terms "financial assistance" or "assistance" in different portions of the Act, this means the aid received from the Stabilization Act is "federal financial aid" within the meaning of the Rehabilitation Act. This argument is also without merit. Plaintiffs are merely cherry picking the Stabilization Act while ignoring Congress's clear intent and its critical use of the word "compensate."

12

Lastly, in an attempt to show that Congress went far beyond compensating the airline industry and provided a subsidy, Plaintiffs cite extensive statements from different members of Congress criticizing the proposed bailout of the airline industry for being too large and unfairly burdening taxpayers. We will not consider such statements in deciding this case because we have already concluded that the statutory provisions at issue are unambiguous, and thus such consideration would be improper. *See, e.g., Am. Bankers Ins. Group v. United States,* 408 F.3d 1328, 1333 (11th Cir. 2005). Nevertheless, even if we did consider such statements or any other portion of the legislative history of the Stabilization Act, there is no mention or indication of subjecting airline carriers to the Rehabilitation Act.

## V. CONCLUSION

For the foregoing reasons, we affirm the district court's order granting the defendants' Motion to Dismiss.

**AFFIRMED.**