# Title X Family Planning Program Proposals

Section 1008 of Title X prohibits Title X programs from counseling and making referrals related to abortion as a method of family planning, except where such counseling and referrals are medically indicated. Such a limitation on the use of government funds does not violate the Constitution.

The Secretary of Health and Human Services is authorized to prohibit Title X programs from engaging in abortion advocacy and to require that organizations engaged in both Title X programs and abortion-related programs segregate the two. Such requirements do not violate the Constitution.

July 30, 1987

MEMORANDUM OPINION FOR THE SENIOR ASSOCIATE COUNSEL
TO THE PRESIDENT

## I. Introduction and Summary

You have requested the opinion of this Office on three proposals to modify the administration of the Title X family planning program. This memorandum confirms our earlier, oral advice to you that the Secretary of Health and Human Services may implement these proposals by appropriate regulations promulgated pursuant to Title X to be effective on or after October 1, 1987.[1]

The three proposals relating to Title X are as follows:[2]

(1) Title X programs would be prohibited from providing counseling and referral for abortion services as a method of family planning;

(2) Title X programs would be prohibited from engaging in abortion-related advocacy activities; and

(3) Organizations maintaining both Title X programs and programs that provide abortion-related services would be required

---

[1] Unless HHS has adopted contrary regulations or special statutory requirements exist, such regulations would not be subject to the notice-and-comment requirements of the Administrative Procedure Act because of the grant exception in 5 U.S.C. § 553(a). We have not, however, examined any specific questions relating to the procedural requirements for promulgating regulations under Title X, or considered whether it would be prudentially advisable to promulgate these proposals by notice-and-comment rulemaking or as revisions to the existing internal departmental guidelines.

[2] There is a fourth proposal relating to medical research by the Surgeon General which we have not addressed.

to segregate the abortion-related programs from the Title X programs.

In brief, our conclusions are as follows. First, we believe that the proposal to restrict counseling and referral for abortion services as a method of family planning is mandated by § 1008 of Title X, but that, in accordance with current regulations, such counseling and referral should be permitted where medically indicated. Second, we believe that the Secretary of HHS has ample statutory authority to prohibit abortion advocacy by Title X programs. Third, we believe that the Secretary of HHS has ample authority to require reasonable physical and other segregation between Title X programs and programs providing abortion-related services. Finally, we believe that the three proposals can be implemented in a constitutional manner.

## II. Analysis

### A. Abortion Counseling and Referral Activities

We believe that § 1008 compels the Secretary of the Department of Health and Human Services (HHS) to prohibit in Title X programs all counseling and referrals related to abortion as a method of family planning, although abortion counseling and referrals should not be prohibited where they are medically indicated. Accordingly, § 8.6 of the HHS's current *Program Guidelines for Family Planning Services*, which requires abortion counseling and referrals in circumstances in addition to where medically indicated, is contrary to the statutory prohibition in § 1008 and should be amended.

Section 1008 of the Family Planning Services and Research Act of 1970, Pub. L. No. 91–572 (codified at 42 U.S.C. § 300a-6), provides:

> None of the funds appropriated under this title shall be used in programs where abortion is a method of family planning.

We believe that this prohibition prevents any program receiving Title X funds from carrying out any activity related to abortion as a method of family planning. We understand the term "abortion as a method of family planning" to include all abortions except where the abortion is medically indicated.

We believe that our construction of § 1008 is supported by both the express language of the provision and by its legislative history. Although HHS has construed this section to permit family planning counseling concerning abortion and family planning referrals for abortion, we believe that this construction is erroneous. In any event, even if HHS's previous interpretation was reasonable, it does not preclude HHS from promulgating regulations on the basis of the construction advanced here given that this interpretation is itself reasonable.

On its face, § 1008 prohibits the granting of government funds to a program in which abortion is a method of family planning. The plain meaning of this language would seem to be that a program that offers any family planning

services related to abortion is a program in which abortion is a method of family planning. In particular, a program that includes abortion among the family planning options about which it counsels women is one in which abortion is a method of family planning. Because a large part of family planning consists of counseling or other forms of information distribution, it cannot be said that counseling is not "family planning."[3]

The view that the plain meaning of § 1008 prohibits abortion counseling and referral is supported by its legislative history. Preeminent among this legislative history is the lengthy speech that Representative Dingell, the sponsor of § 1008, delivered on the subject of abortion and family planning. Representative Dingell made it clear that abortion was simply not a proper method of family planning. He stated:

> There is a *fundamental difference* between the prevention of contraception and the destruction of developing human life. Responsible parenthood requires different attitudes toward human life once conceived than toward the employment of preventive contraceptive devices or methods. What is unplanned contraceptively does not necessarily become unwanted humanly . . . .
>
> *If there is any direct relationship between family planning and abortion, it would be this, that properly operated family planning programs should reduce the incidence of abortion.*

116 Cong. Rec. 37375 (1970) (emphasis added). Representative Dingell's clearly delineated contrast between abortions and preventive contraceptive methods demonstrates that he did not believe abortion was a proper method of family planning. Permitting organizations to provide counseling or referrals with respect to abortion would be squarely at odds with a view that abortion is, unlike contraception, not a method of family planning but a practice which Congress believed family planning services would reduce.

The Conference Committee Report confirms the dichotomy between abortions and preventive contraception. It states:

> [i]t is, and has been, the intent of both Houses that the funds authorized under this legislation be used only to support *preventive* family planning services, population research, infertility services, and other related medical, informational, and educational activities. The conferees have adopted the language con-

---

[3] Moreover, when Congress wished to craft a more narrow prohibition limited to the use of federal funds to provide abortions, it knew how to do so *See* Pub. L. No. 96–123, § 109, 93 Stat. 923, 926 (1979) (prohibiting funds appropriated for Medicaid program from being used to provide abortions). In § 1008, however, Congress chose broader language that prohibited funds from being used to support any program where abortion is a method of family planning. We believe that the plain meaning of § 1008 becomes clearer if one imagines a similar provision that prohibited federal funds from being received by a program in which a particular form of contraception is a method of family planning. It would seem absurd to conclude that such a prohibition permitted family planning counseling about the proscribed form of contraception.

tained in section 1008, which prohibits the use of such funds for abortion, in order to make clear this intent.

H.R. Conf. Rep. No. 572, 91st Cong., 1st Sess. 2 (1970) (emphasis added). Although the Conference Report authorized "medical, informational and educational activities," these activities must be "related" to "preventive family planning services." Counseling concerning abortion is manifestly not related to preventive family planning services, given the explicit contrast between abortion and family planning that Representative Dingell drew on the floor.

Moreover, in his floor statement, Representative Dingell explicitly stated that the prohibition was not limited to the provision of abortions:

> With the "prohibition of abortion" amendment — title X, section 1008 — the committee members clearly intend that abortion is not *to be encouraged or promoted in any way through this legislation*. Programs which include abortion as a method of family planning are not eligible for funds allocated through this act.[4]

116 Cong. Rec. 37375 (1970) (emphasis added).

We believe that counseling or referrals concerning abortions are clearly actions that promote abortion. The purpose of counseling programs for pregnant women is to provide information upon which a course of action may be based. The intended effect of that education is that a pregnant woman select and act upon some of the information and referrals offered. Where abortion counseling and referral comprise a part of the counseling, a program is best construed to include abortion as "a method of family planning" because the intended and actual effect of the counseling and referral is to provide the option of abortion with the natural expectation that some pregnant women will select that method of family planning. Indeed, counseling concerning abortion or any other subject would be pointless in the absence of an expectation that some people will act on the information received.

We are aware that HHS has adopted a construction of § 1008 which permits counseling and referrals concerning abortions as a method of family planning. *See, e.g.,* Memorandum from Cayetano Santiago, Division of Public Health Services Delivery, to the Office of General Counsel (Mar. 4, 1982) (1982 Memorandum); Memorandum from Senior Attorney, Public Health Division to Elsie Sullivan, Assistant for Information and Education Office for Family Planning, HHS (Apr. 14, 1978) (1978 Memorandum). Under this construction, counseling or referrals concerning abortion as a method of family planning are not proscribed under Title X because, according to HHS, neither the purpose nor the principal effect of such counseling or referrals is to promote abortion.[5]

---

[4] It should also be noted that, in enacting Title X, Congress fully understood that family planning included a wide range of services, including counseling and referrals. *See* S. Rep. No. 1004, 91st Cong., 2d Sess. 4 (1970). Therefore, § 1008's reference to family planning should, in the absence of contrary evidence, be deemed to include all such forms of family planning. Accordingly, when a program offers counseling or referrals concerning abortion the program is one in which abortion is one of the methods of family planning.

[5] In the 1978 Memorandum, the test for permitting an abortion-related activity is the immediate effect test, *i.e.,* abortion-related activities may be funded by Title X unless they have the immediate effect of promoting abortion. 1978 Memorandum at 13.

1982 Memorandum at 13. Presumably, this legal construction is the basis for the requirement in the present guidelines that counseling and referrals for abortion *must* be offered, although, at most, this construction would appear only to favor *permitting* rather than *requiring* such counseling.[6]

We believe that the HHS's "purpose or principal effect" test is not warranted by the legislative history, and even if it were, counseling concerning abortion as a method of family planning would be invalid under that test because it would have the "purpose or principal effect" of promoting abortion. First, there is simply nothing in the legislative history of § 1008 to suggest the "purpose or principal effect test" in this context.[7] The language of the statute simply prohibits abortion as a method of family planning. Moreover, the legislative history makes clear that any activity that promotes abortion as a method of family planning is prohibited. Accordingly, if the activity has the effect of promoting abortion as a method of family planning it is prohibited by the statute even if such promotion is not the activity's purpose or principal effect. There is simply no value or goal adduced elsewhere in the statutory scheme which supports the introduction of a limiting principle such as the "purpose or

---

[6] These guidelines provide:
> Pregnant women should be offered information and counseling regarding their pregnancies. Those requesting information on options for the management of an unintended pregnancy are to be given non-directive counseling on the following alternative courses of action, and referral upon request:
> Prenatal care and delivery
> Infant care, foster care, or adoption
> Pregnancy termination.

*Program Guidelines for Project Grants For Family Planning Services* at 13.

[7] The Memorandum from Carol Conrad, Attorney-Adviser, Public Health Division, to Ernest G. Peterson, Associate Bureau Director, Office of Planning (Mar. 19, 1976), contends that the purpose or principal effect test is supported by certain remarks in a debate over provisions in Pub L. No. 94–63, 89 Stat. 304 (1975), to amend § 1004 of Title X, which authorizes the Secretary to make grants "to promote research in the biomedical, contraceptive development, behavioral and program implementation fields related to family planning." The *only* substantive amendment to this provision was to permit the Secretary to conduct such research at HHS as well as making grants to outside organizations. *See* Pub. L. No. 94–63, § 202(c), 89 Stat. at 306. In the course of the discussion of the amendment, Representative Bauman complained that HHS was not carrying out the intent of § 1008 which he saw as "enforc[ing] a wall of separation between family planning and abortion." 121 Cong. Rec. 17218 (1975). He therefore asked and received assurances that § 1004 would not include research on abortion techniques. *Id.* at 17219. Noting that a 1971 House Conference Report stated that § 1008 should not prevent research into the causes of abortion, Representative Bauman asked:
> But I would like to make clear that this language does not allow the HEW to purchase or grant contracts whose *purpose or principal effect* would be to develop new techniques for performing abortions. Would I be correct in assuming that this language does not allow such research?
> Mr. Rogers: That is correct, as a method of family planning.

*Id.* (emphasis added).

Given the context in which they were made, these remarks manifestly cannot be construed as a qualification and limitation on § 1008's prohibition of abortion as a method of family planning. First and foremost, these remarks do not constitute legislative history concerning § 1008 or an amendment to that section, but rather to an amendment to § 1004 that had nothing to do with abortion. The views of a subsequent Congress form a dubious basis for inferring the intent of an earlier legislative action, and clearly cannot override a reasonable interpretation of a statute based on its language and contemporaneous legislative history. *See Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102 (1980). Moreover, because he clearly believed that § 1008 should be given a broader scope, one must completely ignore the purpose of Representative Bauman's remarks to take these as an intended limitation on the meaning of § 1008.

principal effect test" to § 1008's unequivocal expression of disapproval of abortion as a method of family planning. HHS's construction has in effect created a balancing test where there are no values to balance.

Second, we have serious doubts that counseling for abortions as a method of family planning would even pass muster under the "purpose or principal effect" test. The principal and foreseeable effect of counseling on abortions as a method of family planning is that some women will choose abortion as such a method. Indeed, it is impossible to discern what other effect such counseling could have or could be intended to have. In addition, we do not believe that the present guidelines are saved from inconsistency with the mandate of § 1008 by virtue of the fact that they contemplate only "nondirective" counseling. It is probable that Congress intended that all family planning counseling be nondirective, but that does not mean that nondirective abortion counseling is consistent with the prohibition in § 1008.

Although HHS's construction of § 1008, which requires counseling on abortions or referrals as a method of family planning, is fairly well-established, we do not believe that this construction should be deemed binding on this or any future administration.[8] It is a well-settled axiom of administrative law that an administrative construction of a statute even if consistently advanced for a long period of time is binding only to the extent it is supported by valid reasons. *See Burnet v. Chicago Portrait Co.*, 285 U.S. 1, 21 (1932). While weight should be given to an agency's expertise in interpreting a statute it is charged with executing, deference to an administrative interpretation "is constrained by [the] obligations to honor the clear meaning of a statute, as revealed by its language, purpose and history." *See International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 556 n.20 (1979). As we have suggested above, we simply do not believe the "purpose or principal effect" test is warranted given the language, manifest purpose and legislative history of § 1008.

Moreover, although we have concluded that HHS's past interpretation is incorrect as a matter of law, such a conclusion is not necessary in order to promulgate regulations based on the interpretation of § 1008 advanced here. While the reasonableness of a particular construction of a statute may be supported by the fact that such construction is contemporaneous with the enactment of the statute and has been consistently adhered to since that time, a subsequent and different administrative construction is not rendered unreasonable by virtue of its inconsistency with the former construction. In other words, a previous interpretation of a statute no matter how reasonable cannot be deemed to preclude subsequent administrative constructions so long as they are themselves reasonable. *A fortiori*, an erroneous previous interpretation does not preclude a subsequent correct one.

---

[8] HHS formally addressed the issue of counseling and referrals in the 1978 Memorandum, *supra* Although before that time it addressed a number of related issues, such as the provision of Title X funds for scientific research, *see* Memorandum for Jim Goodman, Public Health Division, to Louis M. Hellman, Deputy Assistant Secretary for Population Affairs (Oct. 5, 1972), these opinions constituted ad hoc approaches to particular problems. The 1978 Memorandum was the first to advance a comprehensive theory for the construction of § 1008 in the form of the immediate effect test.

The Executive's permanent discretion to construe statutes it is charged with executing in novel but reasonable ways is a consequence of both the constitutional requirement of the enactment of legislation and the constitutional underpinning of the delegation doctrine. First, a prior administrative construction of the statute no matter how reasonable cannot permanently modify the meaning of the underlying legislation because an administrative construction does not meet the procedural requirements in Article I for the passage of binding legislation. *See INS* v. *Chadha*, 462 U.S. 919 (1983). Accordingly, a particular construction of a statute cannot limit the range of possible constructions that a subsequent administration may adopt. Second, a central premise of the delegation doctrine is that the popularly elected Executive may implement his policy choices within the discretion the statute entrusts to him. *See Chevron U.S.A.* v. *Natural Resources Defense Council*, 467 U.S. 837, 865 (1983).[9] *See also Motor Vehicle Manufacturers Ass'n* v. *State Farm Automobile Insurance Co.*, 463 U.S. 29, 45 (1983) (Congress' ratification of an agency construction through failure to change the underlying statute does not incorporate agency construction into statute). If a prior administrative construction were permitted to circumscribe the discretion of subsequent administrations, the authority Congress delegated would not be exercised in a manner responsive to the popular will.

Accordingly, even if § 1008's meaning were less plain than we believe it to be and the legislative history less clear than it appears to be, this administration would have the discretion to interpret § 1008 to prohibit abortion counseling and referrals.[10] Section 1008 prohibits abortion as a method of family planning and nowhere in the statute is any countervailing policy suggested. Thus, the

---

[9] The *Chevron* court in relevant part stated:

> Judges are not experts in the field, and are not part of either political branch of the government. Courts must, in some cases, reconcile competing political interests, but not on the basis of judges' personal policy preferences. In contrast, an agency to which Congress has delegated policymaking responsibilities may, within the limits of that delegation, properly rely upon the incumbent administration's views of wise policy to inform its judgments. *While agencies are not directly accountable to the people, the Chief Executive is, and it is entirely appropriate for this political branch of the government to make such policy choices — resolving the competing interests which Congress itself either inadvertently did not resolve, or intentionally left to be resolved by the agency charged with the administration of the statute in light of everyday realities*
>
> When a challenge to an agency construction of a statutory provision, fairly conceptualized, really enters on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail. In such case, federal judges — who have no constituency — have a duty to respect legitimate policy choices made by those who do.

467 U.S. at 865 (emphasis added)

[10] Implementing the mandate of § 1008 by prohibiting abortion counseling and referral as a method of family planning is also constitutional While abortion counseling and referral are constitutionally-protected activities, the government is under no constitutional obligation to subsidize those activities. What the government is forbidden to do under the doctrine of "unconstitutional conditions" is to require that a grantee not engage in a constitutionally-protected activity with nongovernmental funds as a condition of receiving governmental funds or benefits As discussed more fully in the subsequent sections of this memorandum, so long as any restrictions on abortion counseling and referral are limited to the Title X programs themselves (as opposed to other programs conducted by the same organization) and are a reasonable implementation of the statutory prohibition, no "unconstitutional condition" will be created

administrator of the statute has discretion to effectuate this prohibition in any way that is reasonable and consistent with the statutory scheme.[11]

We reiterate, however, that the prohibition on abortion counseling and referrals should not apply when abortion is medically indicated. Section 1008's prohibition is limited to abortion as a "method of *family planning*." Abortions that are medically indicated are not a method of family planning but rather are medical procedures. This view is embodied in 42 C.F.R. § 57.5(b)(1) which requires that Title X grantees "provide for medical services related to family planning . . . and necessary referral to other medical facilities when medically indicated."[12] Accordingly, limiting the implementation of § 1008's prohibition to abortion as a method of family planning makes it unnecessary to address any statutory and constitutional questions that would need to be resolved before this regulation could be changed.[13]

## B. Abortion Advocacy

The previous section of this memorandum concluded that § 1008 mandates that Title X programs be prohibited from providing counseling and referral for abortion services as a method of family planning. That statutory analysis is equally applicable to the proposal to prohibit Title X programs from engaging in abortion-related advocacy activities. Section 1008 — particularly when read against the background of its legislative history — furnishes HHS with an ample mandate to prohibit Title X programs from in any way promoting abortion as a method of family planning, and abortion advocacy is clearly a form of promoting abortion. The only caveat we would cite is that, for reasons noted above, guidelines should not be drafted so broadly as to prohibit advocacy of abortion when abortion is medically indicated.

In addition to being authorized by the statute, a prohibition on abortion advocacy would be constitutional. Although abortion advocacy is a form of expression protected by the First Amendment, *see Bigelow* v. *Virginia*, 421 U.S. 809 (1975) (statute making it a misdemeanor to sell or circulate any

---

[11] Of course issuing these new guidelines or new directives would represent a change in policy, and HHS would have to supply a "'reasoned analysis'" of why it is changing its position. *See Motor Vehicle Manufacturers Ass'n* v. *State Farm Mutual Automobile Insurance*, 463 U.S. 29, 57 (1983) (quoting *Greater Boston Television Corp.* v. *FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970), *cert. denied*, 403 U.S. 923 (1971)). Although changed circumstances are not needed to supply the basis for such a change in position, *see* 463 U.S. at 157, the agency must offer some reason for the action it undertakes.

[12] The construction of § 1008 embodied in this regulation is supported by the legislative history. For instance, in his lengthy speech on the floor, Representative Dingell contrasted abortion as a method of family planning with abortions performed for medical reasons. *See* 116 Cong. Rec. 37379 (1980).

[13] Limiting the prohibition on abortion as a method of family planning is also advisable to avoid conflict with *Valley Family Planning* v. *North Dakota*, 661 F.2d 99 (8th Cir. 1981). In that case, the U.S. Court of Appeals for the Eighth Circuit invalidated a state statute that prohibited federal funds passing through a state treasury from being used as family planning funds by any agency that performs, refers or encourages abortion on the ground that the statute conflicted with Title X of the Public Health Service Act. The specific conflict the court identified was that the flat prohibition on abortion was inconsistent with "Title X's mandate that comprehensive health care provided, including referrals to other services when *medically indicated*." 661 F.2d at 102 (emphasis added).

publication encouraging or promoting the procuring of an abortion declared an infringement of speech), the government is under no obligation to subsidize particular forms of expression. *See Regan* v. *Taxation With Representation of Washington,* 461 U.S. 540, 546–547, 599 (1983) (in granting tax exemption to certain nonprofit organizations that do not engage in lobbying activities, Congress simply chose not to pay for nonprofit corporation's lobbying out of public funds, and did not regulate any First Amendment activity).

Accordingly, while an organization may have a constitutional right to speak in favor of abortion, it does not have a right to have its advocacy subsidized by the federal government. Thus, the government can prohibit programs receiving Title X funds from spending those funds to promote abortion. On the other hand, the government cannot preclude organizations whose programs receive Title X funds from using nongovernmental resources in other programs to advocate abortion.[14]

## C. Segregation of Title X Programs from Abortion-Related Programs

The statutory issue presented by the proposal to segregate abortion-related programs from Title X programs is the program-specific language of Title X's abortion restrictions. As interpreted by the Supreme Court in *Grove City College* v. *Bell,* 465 U.S. 555 (1984), and its progeny, such language has been construed in accordance with its plain meaning — restrictions apply to the *program* only, not to the *organization* within which that program exists. The constitutional issue is closely linked to the statutory issue: the government may refuse to subsidize the exercise of a constitutional right (such as abortion advocacy), but it may not refuse to provide other government benefits on the grounds that such a constitutional right is being exercised. Requiring program segregation could be viewed as burdening an organization that exercises rights that have been held by the Court to be constitutionally-protected and thereby indirectly conditioning the grant of government benefits on relinquishment of constitutional rights. We conclude, however, that HHS may require reasonable segregation between Title X programs.

---

[14] It should be noted, however, that the fact that government is not required to subsidize abortion advocacy, does not mean that Title X funds could necessarily be used to subsidize anti-abortion advocacy. First, there is some question — even given § 1008 — whether the use of Title X funds for anti-abortion advocacy is within the scope of the statute. Second, while the Constitution does not require the government to subsidize abortion advocacy, if Title X regulations were to permit anti-abortion advocacy while forbidding pro-abortion advocacy, they might be subject to challenging as a form of unconstitutional viewpoint discrimination. *Cf. Regan* v. *Taxation With Representation of Washington,* 461 U.S. 540, 548 (1983) (while Congress did not violate appellee's constitutional rights "by declining to subsidize its First Amendment activities," a different case would be presented "if Congress were to discriminate invidiously in its subsidies"). By noting the caveat, however, we do not mean to suggest necessarily that a mere negative reference to abortion in the course of family planning counseling — for instance, an observation by the counselor that one of the virtues of preventive family planning is that it avoids the medical risks entailed by an abortion — should be viewed as "anti-abortion advocacy" and thus trigger these statutory and constitutional concerns.

In *Grove City, supra,* the Supreme Court held that the language in § 901(a) of Title IX of the Education Amendments prohibiting sex discrimination in "any education program or activity receiving Federal financial assistance" meant that the sanction imposed by Title IX — the cut-off of the federal student grants provided by the statute — could only be imposed on the program receiving the financial assistance, not on the institution or organization of which that program was a part. On the facts of *Grove City,* the Court held that the relevant "program" was the financial aid program and not Grove City College as a whole.

The construction in *Grove City* of the phrase "program" in Title IX has been applied by the Supreme Court and by lower federal civil rights statutes which prohibit discrimination in programs receiving federal assistance. *See, e.g., U.S. Dep't of Transp.* v. *Paralyzed Veterans,* 477 U.S. 597 (1986) (§ 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794). Although Title X is not a civil rights statute on the model of Title IX of the Education Amendments, *see id.* at 600 n.4, there is no reason to believe that the term "program" in Title X should be interpreted any differently than it was interpreted by the Supreme Court in *Grove City.* Thus, the prohibition in § 1008 on the use of funds where abortion is a method of family planning must — as the statute expressly provides — be applied only to the specific program at issue.

In assessing the range of possible guidelines in light of the program-specific language of § 1008, it is useful to view several hypothetical proposals along a continuum. At one extreme, for instance, we believe that a proposal which would require that each Title X program maintain separate accounting records would be entirely consistent with the program-specific language of § 1008. To ensure compliance with the congressional mandate in § 1008, HHS must, at the very least, be able to determine that there is a distinct "program" providing family planning services, and requiring separate accounting records would seem to be an eminently reasonable means of ensuring that HHS will have the means to make that determination.

On the other hand, a proposal that separate entities be established to conduct the Title X program would fall at the other extreme of the continuum. While *Grove City* does not provide criteria for defining a "program," it does establish the principle that "program" does not mean "organization" or "institution." Moreover, it appears that the statutory requirement of program-specificity is met notwithstanding the fact that the program has links with other programs within an organization. As the Supreme Court observed in *Paralyzed Veterans, supra:* "In *Grove City,* despite the arguably 'indissoluble nexus' among the various departments of a small college, we concluded that only the financial aid program could be subject to Title IX." 477 U.S. at 611.

To require that a Title X program be limited to a separate corporation or other distinct juridical entity would be, in effect, to require that it be conducted by a separate organization. As such, it would be inconsistent with *Grove City's* construction of the term "program." In *Grove City* itself, for instance, the Court held that the financial aid department was a separate "program" within Grove

City College, although it was apparent from the facts that the financial aid department had no juridical identity apart from Grove City College. Lower court decisions have similarly held that various activities constituted "programs" without even addressing whether such activities were conducted within a separate juridical entity. *See, e.g., Jacobson* v. *Delta Airlines, Inc.*, 742 F.2d 1202 (9th Cir. 1984) (airlines service to small communities was a separate program), *cert. dismissed*, 471 U.S. 1062 (1985); *O'Connor* v. *Peru State College*, 781 F.2d 632 (8th Cir. 1986) (physical education department was separate program within college).[15]

We also think that a very extreme requirement of functional separation would be at odds with the program-specific language of § 1008. If total *de jure* separation cannot be required between different programs, then total *de facto* separation cannot be required either. Again, it is useful to advert to *Grove City* and its progeny. In *Grove City*, the Court did not even inquire as to whether separate physical facilities existed or whether the financial aid program had its own full-time staff that did not perform work in other college programs. Similarly, in *Jacobson* v. *Delta Airlines, supra*, the Court held that the small community service was a separate program without mentioning whether there was any separation of facilities or separate staff. It seems highly likely that there was no such functional separation; presumably, for instance, tickets to flights to the small communities were sold at the same Delta flight counters by the same personnel who sold tickets to the major cities. Thus, we think that a proposal which requires total functional separation between programs would be inconsistent with *Grove City*.

However, if a requirement of total functional separation is inconsistent with the program-specific statutory language, it is nevertheless important not to slight the specific prohibition of § 1008 — a factor not present in the *Grove City* line of cases. Thus, a reasonable amount of functional separation may not only be possible, but required. For instance, it may be reasonable in some cases to require that the abortion counseling be provided in a different office than the family planning counseling. This separation would become increasingly important if it was the only reasonable means to segregate abortion-related materials or personnel from the family planning context.

Nevertheless, we caution that a functional separation requirement may, in a given case, be argued to be an unconstitutional condition. As we indicated above, the government may not condition the receipt of Title X funds on a grantee's promise not to undertake abortion-related activities with nongovernment funds. For the same reason, the government must be wary of imposing unreasonable functional separation requirements. Thus, it is impor-

---

[15] Of course, if a program were conducted within a separate corporate entity, it might strengthen the conclusion that a distinct program existed. *Cf. Eivins* v. *Adventist Health System/Eastern & Middle America, Inc.*, 651 F. Supp. 340 (D. Kansas 1987) (holding as a matter of law that a nonprofit corporation acting as a holding corporation for certain hospitals and providing services to others was not within the same "program" as such hospitals) But this conclusion does not support the converse: that an activity must be separately incorporated to constitute a program.

tant that the new guidelines requiring a level of functional separation impose restrictions that can be feasibly complied with by grantee organizations that also provide abortion-related programs with nongovernmental funds.*

DOUGLAS W. KMIEC
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

*NOTE: Subsequent to this opinion, HHS promulgated the regulations discussed herein. 53 Fed. Reg. 2922 (1988) (codified at 42 C.F.R. Part 59). A facial challenge to the regulations was rejected by the Supreme Court, which held that they constituted a permissible construction of § 1008 and were consistent with the First and Fifth Amendments to the Constitution. *Rust* v. *Sullivan*, 111 S. Ct. 1759 (1991).