Susan BOSWELL, Plaintiff,

v.

SKYWEST AIRLINES, INC., a Utah corporation, Defendant.

No. 200CV00950PGC.

United States District Court,
D. Utah,
Central Division.

Aug. 22, 2002.

Carl Boyd, Jr., Cedar City, UT, Paul A. Curtis, Salt Lake City Prosecutors Office, Robert B. Denton, John Pace, Salt Lake City, UT, for Plaintiff.

Heidi E. Leithead, Parr Waddoups Brown Gee & Loveless, Darren K. Nelson, Parr Waddoups Brown Gee & Loveless, Salt Lake City, UT, for Defendant.

## OPINION AND ORDER

CASSELL, District Judge.

Plaintiff Susan Boswell ("Boswell") filed this action against defendant SkyWest Airlines, Inc. ("SkyWest") under section 507 of the Rehabilitation Act of 1973, as amended, and the Air Carrier Access Act seeking to require SkyWest to provide medical oxygen for her use on its flights between St. George, Utah and Salt Lake City, Utah. The Court concludes that Boswell's claims must be dismissed because (1) SkyWest does not receive federal financial assistance either as a whole or with respect to its flights between St. George and Salt Lake City and thus is not subject to the requirements of section 504 of the Rehabilitation Act ("Section 504") and (2) the Air Carrier Access Act does not require SkyWest Airlines to provide oxygen for medical use by its passengers.

## BACKGROUND

The facts are not in dispute. Plaintiff Boswell resides in Southern Utah. Due to a lung disease, she has difficulty breathing.[1] Boswell has requested that SkyWest provide supplemental medical oxygen for her personal use during flights between St. George, Utah and Salt Lake City, Utah. SkyWest has refused that request.

Defendant SkyWest is incorporated under the laws of Utah. SkyWest provides approximately 1000 daily flights to 66 cities in 14 western states and Canada. It is an air carrier "certified" by the U.S. Department of Transportation, Federal Aviation Administration, that operates daily flights in Utah and elsewhere and thus is

---

1. Affidavit of Susan Boswell, at ¶ 1 (the "Boswell Aff.," as attached to Defendant's Memorandum of Points and Authorities in Support of Motion for Summary Judgment as Exhibit "A;" Answer at ¶ 1 (January 10, 2001)).

subject to the legal requirements imposed by the Air Carrier Access Act ("ACAA")[2] and regulations promulgated to enforce the ACAA.[3] As of March 2001, SkyWest was receiving approximately $1.9 million in financial assistance from the United States Department of Transportation to participate in the federal Essential Air Service Program ("EAS Program").[4] Further details about the program will be discussed later in this opinion.

SkyWest operates two different planes, an Embraer–120 Brasilia and a Canadair Regional Jet. Both these planes are powered by turbine engines, have pressurized cabins, and are certified to operate at flight altitudes up to and including flight level 250. SkyWest primarily uses an Embraer–120 Brasilia on its flights between St. George and Salt Lake City. On this flight, SkyWest operates the airplane at altitudes in excess of 10,000 feet.

SkyWest provides supplemental oxygen for use in the event of cabin depressurization and for first aid or other emergency, as directed in regulations promulgated by the Federal Aviation Administration.[5] SkyWest does not provide medical oxygen for use by passengers.[6] In the event of an unexpected medical emergency, SkyWest may use the supplemental oxygen intended for cabin depressurization and first aid to assist a passenger.[7]

## ANALYSIS

Boswell argues that applicable federal laws and regulations require SkyWest to provide her with medical oxygen for her use during its flights between St. George, Utah and Salt Lake City, Utah. To support her claim, Boswell relies both on the requirements of Section 504 of the Rehabilitation Act and on the Air Carrier Access Act. Boswell's claim fails for two reasons. First, Section 504 does not apply to SkyWest's flights between St. George and Salt Lake City because SkyWest receives neither financial assistance as a whole nor financial assistance on this particular route. Thus, SkyWest has no obligation to accommodate Boswell's request for medical oxygen under Section 504.

Second, the Air Carrier Access Act does not require an air carrier to provide medical oxygen to its passengers. Instead, the Act only allows the provision of such oxygen under a program specifically approved by the Federal Aviation Administration. Because SkyWest does not have such an approved program, and therefore does not supply medical oxygen for passenger use during flights, it is not obligated to provide such oxygen to Boswell.

I. SECTION 504 OF THE REHABILITATION ACT DOES NOT APPLY TO SKYWEST'S SALT LAKE CITY TO ST. GEORGE ROUTE BECAUSE SKYWEST DOES NOT RECEIVE FINANCIAL ASSISTANCE FOR THIS ROUTE.

Boswell contends that, because SkyWest receives federal financial assistance under the EAS Program, it must provide medical oxygen for her use. Boswell concedes that

2. 49 U.S.C. §§ 41705, et seq.

3. *See, e.g.,* 14 C.F.R. § 382.5 (ACAA definition of "air carrier").

4. U.S. Dept. of Transportation, Office of the Assistant Secretary for Aviation and International Affairs, *U.S. Subsidized Essential Air Service Report* (July 1, 2000); *see* http://www.ostpxweb.dot.gov/aviation/rural/us03–01.pdf (government listing SkyWest's

federal subsidaries at §§ 10,11 and 76). *See generally* 49 U.S.C.A. §§ 41731 through 41742 (West 1997 & Supp.2001) (describing EAS Program).

5. *See* 14 C.F.R. § 121.33 (2001).

6. *See* 49 C.F.R. § 121.574.

7. Ashworth Decl., ¶ 12.

SkyWest does not receive financial assistance directly for this particular route. She urges, however, that the EAS assistance provided on other routes creates a general obligation for SkyWest to follow Section 504 of the Rehabilitation Act. Section 504 provides,

> Nondiscrimination under Federal grants and programs
>
> (a) Promulgation of rules and regulations. No otherwise qualified individual with a disability in the United States, as defined in section 7(20), shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by an Executive agency or by the United States Postal Service.

As relevant to this case, Section 504 defines the phrase "program or activity" as including the operations of

> (3) (A) an entire corporation, partnership, or other private organization, or an entire sole proprietorship-
>
> (i) if assistance is extended to such corporation, partnership, or sole proprietorship *as a whole* [8]; ...

Thus, the central issue in this case is whether the federal government has extended assistance to SkyWest "as a whole." Boswell bears the burdens of showing that SkyWest, as a whole, receives federal financial assistance.[9]

---

**8.** 29 U.S.C.A. § 794 (emphasis added).

**9.** *See Johnson by Johnson v. Thompson,* 971 F.2d 1487, 1492 (10th Cir.1992).

**10.** P.L. 93–113, 87 Stat. 355, 394 (1973).

**11.** S.Rep. No. 100–64 at 6–9 (legislative history of the Civil Rights Restoration Act of 1987 amending section 504 of the Rehabilitation Act), reprinted in 1988 U.S.C.C.A.N.

## A. BACKGROUND OF THE DEFINITION OF "PROGRAM OR ACTIVITY" UNDER SECTION 504 OF THE REHABILITATION ACT.

Congress enacted the Rehabilitation Act in 1973. At the time of its enactment, the statute stated that "[n]o otherwise qualified handicapped individual in the United States ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."[10] The nondiscrimination language of Section 504 parroted language found in Title IX of the Education Amendments Act of 1972 and Title VI of the Civil Rights Act of 1964.[11] Nothing in that statute, however, defined the term "program or activity." Before 1984, courts and the executive branch had defined often "program or activity" broadly to include institution-wide coverage of any entity, including private entities, who received federal financial assistance for any part of its operations or activities.[12] In *Grove City College v. Bell,*[13] the United States Supreme Court rejected this institution-wide approach and held that the nondiscrimination language of Title IX of the Education Amendments of 1972 (and by analogy the nondiscrimination language of Section 504) only applied to the specific program or activity that received the federal financial assistance.[14]

---

**12.** *See id.* at 9–13.

**13.** 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984).

**14.** *See id.* at 571–574, 104 S.Ct. 1211. See also S.Rep. No. 100–64 at 9.

■ In response to the *Grove City* decision, Congress enacted the Civil Rights Restoration Act of 1987.[15] This Act added the definition of "program or activity" to—among other statutes—Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments Act of 1973, and—importantly for present purposes—Section 504 of the Rehabilitation Act.[16] In defining "program or activity," the Act distinguishes between public entities such as an "instrumentality of a State or of a local government" and private organizations.[17] While the term "program or activity" includes all the operations of certain public entities, it does not include all operations of a private entity if that private entity receives federal funds for a specific and limited purpose. Therefore, with respect to private organizations such as SkyWest, the statutory definition of "program or activity" was not expanded to the pre-*Grove City* institution-wide definition. Instead, for private entities, Congress defined "program or activity" under Section 504 as including all of the operations of a corporation only "if [federal financial] assistance is extended to such corporation, partnership, private organization, or sole proprietorship *as a whole* . . . ."[18]

The legislative history of the amendment demonstrates the limited scope of section 504's coverage as it relates to corporations and other private entities. The legislative history reads:

> The bill provides that a corporation, partnership, or other private organization or sole proprietorship will be covered in its entirety if it receives federal financial assistance which is extended to it as a whole or if it is principally engaged in certain kinds of activities [education, health care, housing, social ser-

vices, or parks and recreation]. In all other instances, coverage will be limited to the geographically separate plant or facility which receives the federal funds. Federal financial assistance extended to a corporation or other entity "as a whole" refers to situations where the corporation receives general assistance that is not designated for a particular purpose. Federal financial assistance to the Chrysler Company for the purpose of preventing the company from going into bankruptcy would be an example of assistance to a corporation "as a whole." Federal aid which is limited in purpose, e.g., Job Training Partnership Act (JPTA) funds, is not considered aid to the corporation as a whole, even if it is used at several facilities and the corporation has the discretion to determine which of its facilities participate in the program . . . Further, federal financial assistance that is earmarked for one or more facilities of a private corporation or other private entity when it is extended is not assistance to the entity "as a whole." Nor does S. 557 embody a notion of "freeing up." Federal financial assistance to a corporation for particular purposes does not become assistance to the corporation as a whole simply because the receipt of the money may free up funds for use elsewhere in the company.

\* \* \* \* \* \*

> If a corporation, partnership, other private organization, or sole proprietorship is not principally engaged in one of the activities delineated above, and receives federal financial assistance which is not extended to it "as a whole," only the fully operations of the geographically separate facility will be covered by the civil rights laws.[19]

---

15. P.L. 100–259, 102 Stat. 28 (1987).

16. *See id.*

17. 29 U.S.C.A. § 794(b).

18. *Id.* § 794(b)(3)(A) (emphasis added).

19. S.Rep. No. 100–64 at 19–20.

Thus, the issue in this case boils down to whether SkyWest receives financial assistance as whole.

## B. SKYWEST DOES NOT RECEIVE FEDERAL FINANCIAL ASSISTANCE AS A WHOLE.

■ SkyWest "as a whole" does not receive federal financial assistance. Instead, it receives an EAS Program payment for serving particular rural airports and potentially unprofitable routes. This payment is calculated by subtracting the projected ticket sales revenues from the total of expected costs and adding a 5% profit margin. At the time Boswell filed her complaint, SkyWest operated three EASP subsidized routes: between Salt Lake City, Utah and Cedar City, Utah; between Merced, California and Los Angeles, California; and between Crescent City, California and San Francisco or Sacramento, California. To participate in the EAS Program, SkyWest submitted a separate bid to the Department of Transportation to provide essential air services on each of these three routes.

Under the EAS Program, the Department of Transportation pays an EAS carrier, like SkyWest, on an after-the-fact, monthly basis. In particular, the Department of Transportation compensates the carrier once a month based on the number of flights actually flown by the EAS carrier.[20] To receive the payment under the EAS Program, at the end of each month, SkyWest submits an invoice to the Department of Transportation. For each of the three routes, SkyWest lists the actual number of flights completed. After reviewing the information provided, the De-

partment of Transportation pays the per flight award to SkyWest.[21]

The EAS Program is Congress' response to the concern that certain rural areas might have suffered under the Airline Deregulation Act of 1978. That Act gave airlines almost total freedom to determine which markets to serve domestically and what fares to charge for that service. Congress was concerned that air carriers no longer would be willing to provide air transportation services into small communities with relatively low traffic levels and would switch all available resources to large, more lucrative markets. To address that problem, Congress adopted the EAS Program to guarantee that small communities that were served by certified air carriers before deregulation would maintain a minimal level of scheduled air service.[22]

Under the EAS Program, the Department of Transportation (the "DOT") determines the minimum level of service required at each eligible community by specifying a hub through which the community is linked to the national network, a minimum number of round trips and available seats that must be provided to that hub, certain characteristics of the aircraft to be used, and the maximum permissible number of intermediate stops to the hub. Where necessary, DOT makes a payment to a carrier to ensure that the specified level of service is provided.[23]

The Department of Transportation awards contracts under the EAS Program through a bidding process. Interested carriers submit a bid that sets out, in detail, the estimated costs of operating the

**20.** Christensen Decl. at ¶ 22.

**21.** Christensen Decl., ¶¶ 22–24.

**22.** Office of Aviation Analysis, *What is Essential Air Service* (Revised May 1, 1998), *http:// ostpxweb.dot.gov/aviation/rural/ruralair. htm.*

**23.** *Id.* 14 C.F.R. §§ 258.1 through 258.6 (2001).

route, at the levels set by the Department of Transportation, and the project revenues for the period of the proposed contract (usually two years). DOT also considers the need for carriers to remain profitable. The Department of Transportation has determined that the "reasonable return for a carrier providing essential air service at an eligible place generally will be set at a flat percentage, typically 5 percent of that carrier's projected operating costs . . ." [24]

The Department of Transportation makes the payment to the air carrier on a monthly, after-the-fact basis. The authorized subsidy amount is converted to a dollar amount per flight. At the end of every month, the carrier submits a claim for the number of flights actually completed. DOT pays the subsidy to the carrier based on the monthly report submitted by the carrier. While the payment rate will not vary during the period of the contract, even if the actual revenues or costs differ from projections, the actual amount of the monthly subsidy may vary, based on the factors set out in the regulations.[25]

Based on these undisputed facts SkyWest does not receive federal financial assistance "as a whole" from DOT. It does not receive the EAS Program money generally. In fact, it does not even receive the money in a lump sum. Rather, SkyWest receives monthly payments contingent on providing actual flight service on three particular routes.

This District Court has, in fact, previously reached exactly this conclusion. In *Americans Disabled for Accessible Public Transportation (ADAPT), Salt Lake Chapter v. SkyWest Airlines, Inc.,*[26] Judge

Sam faced the same issues presented in this case. In *ADAPT*, the plaintiff, who was confined to a wheelchair, filed an action alleging that SkyWest improperly refused to allow her to board an airplane from Boise, Idaho to Salt Lake City, Utah and to book a further reservation from Salt Lake City to Vernal, Utah. Plaintiff sought recovery, among other things, under the Air Carrier Access Act and Section 504.[27] This Court held that the plaintiff could not state a claim under Section 504 with respect to the flight from Boise to Salt Lake City because SkyWest did not receive essential air service funding for that particular route. This Court relied on the Ninth Circuit's decision in *Jacobson v. Delta Airlines, Inc.*[28] In *Jacobson*, the plaintiff, a disabled individual, alleged a violation of Section 504 based on Delta Airline's requirement that he sign a special medical certificate as a condition of boarding. Among other grounds, plaintiff argued that he had standing under Section 504 based on Delta Airline's receipt of subsidies under the essential Air Services Program.[29] The Ninth Circuit rejected the plaintiff's argument, concluding:

the Rehabilitation Act . . . applies only to "programs receiving Federal financial assistance" . . . Although the definition of "program" is as yet unsettled, we are confident that the "program" here is the small community service program. First, the House Report refers to the section 419 program as the "small community service program." Second, insofar as the federal payments assist the air carrier, they assist it only to the extent necessary to carry on the small community service program.[30]

24. 14 C.F.R. § 271.6 (2001).

25. *Id.* §§ 271.7 and 271.8.

26. 762 F.Supp. 320 (D.Utah 1991).

27. *Id.* at 322.

28. 742 F.2d 1202 (9th Cir.1984).

29. *Id.* at 1204, 1210.

30. *Id.* at 1211.

*Jacobson* was decided prior to the 1987 amendment to the Rehabilitation Act discussed above and was based on the narrow definition of "program" delineated by the United States Supreme Court in *Grove City College.*[31] However, the decision is consistent with the current definition of "activity or program" with respect to private corporations, as set out in the 1987 amendment. More important, the Tenth Circuit has suggested it agrees with *Jacobson.* In 1990, the Tenth Circuit states in *DeVargas v. Mason and Hanger–Silas Mason Co., Inc.,*[32] that "[w]e agree with the *Jacobson* court's conclusion that 'in determining which programs are subject to the civil rights law, courts should focus not on market value but on the intention of the government' to give a subsidy, as opposed to government intent to provide compensation."[33] To be sure, *DeVargas* involved the issue of whether a company was receiving financial assistance rather than the issue of whether such assistance was being provided to the company "as a whole." But the Circuit's favorable discussion of *Jacobson* cannot be ignored. Moreover, the government's intent in adopting the EAS Program was clearly not to provide a general subsidy to airline operations, but rather to provide compensation for airlines that flew particular, possibly unprofitable, routes.

For all these reasons, SkyWest does not receive federal financial assistance either as a whole or for its St. George to Salt Lake City route. Thus, Section 504 does not apply, and Boswell may not rely on it to state a claim against SkyWest. Summary Judgment is therefore granted for SkyWest on Count II of Boswell's Complaint.

## II. THE AIR CARRIER ACCESS ACT DOES NOT REQUIRE SKYWEST TO PROVIDE MEDICAL OXYGEN TO BOSWELL FOR HER USE DURING FLIGHT.

### A. THE SPECIFIC PROVISIONS OF THE AIR CARRIER ACCESS ACT DO NOT REQUIRE AN AIRLINE TO PROVIDE MEDICAL OXYGEN FOR USE BY PASSENGERS.

Congress adopted the Air Carrier Access Act on October 2, 1986.[34] The ACAA reads,

In providing air transportation, an air carrier may not discriminate against an otherwise qualified individual on the following grounds:

(1) the individual has a physical or mental impairment that substantially limits one or more major life activities.

(2) the individual has a record of such an impairment.

(3) the individual is regarded as having such an impairment.[35]

The Department of Transportation has promulgated regulations enforcing the requirements of the ACAA. These regulations are found in Part 382 of the applicable Code of Federal Regulations.[36] Because the Department of Transportation has been charged by Congress with enacting regulations to enforce the requirements of the ACAA, the regulations issued by DOT have the force and effect of law.[37]

---

31. *Id.*

32. 911 F.2d 1377 (10th Cir.1990), *cert. denied* 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 860 (1991).

33. *Id.* at 1382 (quoting *Jacobson* ).

34. P.L. No. 99–435, 100 Stat. 1080.

35. *Id.*

36. 14 C.F.R. Part 382.

37. *See, e.g., Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859, 874 (D.C.Cir.1970) ("The regulations of the Federal Aviation Administration have the force of law.")

Among other things, Part 382 provides that an air carrier generally may not refuse to provide transportation to a qualified individual with a disability; may not require the disabled individual to travel with an attendant except in specific circumstances; may not require a disabled individual to sit in any particular seat; must provide certain seating accommodations at the request of the disabled individual; must provide for the stowage of personal equipment related to the individual's disability (e.g., wheelchairs, etc.); and must permit a service animal to accompany the disabled individual.[38] Part 382 also specifically provides that air carriers must ensure that qualified individuals with a disability are provided certain services and equipment. Those services and equipment include assistance with enplaning and deplaning (including the assistance of services personnel and the use of specified wheelchairs, ramps, or mechanical lifts); provide services within the aircraft cabin (including assistance moving to and from seats as part of the enplaning and deplaning process, assistance in preparing for eating, assistance in the use of an on-board wheelchair to enable the person to move to and from the lavatory); provide assistance to a semi-ambulatory individual in moving to and from the lavatory; and provide assistance in loading and retrieving carry-on items.[39]

■ Nothing in Part 382 requires an air carrier to provide medical oxygen for use by a passenger. If anything, particular sections of Part 382 make clear that no such requirement exists. For example, Section 382.33 discusses the advance notice requirements that a carrier may impose on a disabled individual. That section states,

(b) A carrier may require up to 48 hours advance notice and one-hour advance check-in concerning a qualified individual with a disability who wishes to receive any of the following services, types of equipment, or accommodations:

(1) Medical oxygen for the use on board the aircraft, *if this service is available on the flight ....* [40]

Thus, in the very section of the regulations that addresses the accommodations that must be provided to the disabled, the Department of Transportation made clear that those accommodations do not impose an obligation to provide medical oxygen for use by passengers.

This language in Section 382.33(b)(1) is consistent with other regulations adopted by the Department of Transportation for the safe operation of airlines. Section 121 of the DOT regulations sets out in detail the numerous operational requirements imposed on air carriers. This section addresses the provision of medical oxygen for use by passengers in some detail. Section 121.574 provides:

(a) A certificate holder *may* allow a passenger to carry and *operate* equipment for the storage, generation, or dispensing of oxygen *when the following conditions are met:*

(1) The equipment is-

(i) *Furnished by the certificate holder;*

(ii) Of an approved type or is in conformity with the manufacturing, packaging, marking, labeling, and maintenance requirements of 49 C.F.R. parts 171,172, and 173, except § 173.24(a)(1);

---

**38.** See sections 382.31,382.35, 382.37, 382.38, 382.41 and 382.55.

**39.** 14 C.F.R. at § 382.39.

**40.** 14 C.F.R. at § 382.33(b)(1) (emphasis added).

(iii) Maintained by the certificate holder in accordance with an approved maintenance program;

(iv) Free of flammable contaminants on all exterior surfaces;

(v) Capable of providing a minimum mass flow of oxygen to the user of four liters per minute;

(vi) Constructed so that all valves, fittings, and gauges are protected from damage; and

(2) When the oxygen is stored in the form of a liquid, the equipment has been under the certificate holder's approved maintenance program since its purchase new or since the storage container was last purged.

(3) When the oxygen is stored in the form of a compressed gas as defined by 49 C.F.R. 173.300(a)-

(i) The equipment has been under the certificate holder's approved maintenance program since its purchase new or since the last hydrostatic test of the storage cylinder; and

(ii) The pressure in any oxygen cylinder does not exceed the rated cylinder pressure.

(4) Each person using the equipment has a medical need to use it evidenced by a written statement to be kept in that person's possession, signed by a licensed physician . . .

(5) When a physician's statement us required by paragraph (a)(4) of this section, the total quantity of oxygen carried is equal to the maximum quantity of oxygen needed, each hour, as specified by the physician's statement, multiplied by the number of hours used to compute the amount of airplane fuel required by this part.

(6) The pilot in command is advised when the equipment is on board, and when it is intended to be used.

(7) The equipment is stowed, and each person using the equipment is seated, so as not to restrict access to or use of any required emergency, or regular exit or of the aisle in the passenger compartment.

(b) No person may, and no certificate holder may allow any person to, smoke within 10 feet of oxygen storage and dispensing equipment carried in accordance with paragraph (a) of this section.

(c) No certificate holder may allow any person to connect or disconnect oxygen dispensing equipment, to or from a gaseous oxygen cylinder while any passenger is aboard the airplane.

(d) The requirements of this section do not apply to the carriage of supplemental or first-aid oxygen and related equipment required by this chapter.[41]

The discretionary language in this section—an airline "*may* allow a passenger" to operate oxygen provided by the airline (the "certificate holder")—strongly suggests that an air carrier is not required to provide oxygen. If the carrier chooses to do so, the section indicates that the carrier must provide that medical oxygen in accordance with a maintenance program approved by the FAA that complies with the strict requirements of section 121.574.

B. THE GENERAL PROVISIONS OF THE AIR CARRIER ACCESS ACT DO NOT REQUIRE AN AIRLINE TO PROVIDE MEDICAL OXYGEN FOR USE BY PASSENGERS.

■ Although the specific regulations dealing with the provision of oxygen cut

---

41. 14 C.F.R. § 121.574 (2001) (emphasis added).

squarely against Boswell, she contends that a more generic regulation essentially supercedes these provisions. In particular, Boswell cites 14 C.F.R. 382.7, which provides:

> a) A carrier shall not, directly or through contractual, licensing, or other arrangements:
>
> > (1) Discriminate against any otherwise qualified individual with a disability, by reason of such disability, in the provision of air transportation ....
>
> (c) *Carriers shall, in addition to meeting the other requirements of this part, modify policies, practices, and facilities as needed to ensure nondiscrimination, consistent with the standards of section 504 of the Rehabilitation Act, as amended.* Carriers are not required to make modifications that would constitute an undue burden or would fundamentally alter their program.

Boswell contends that this general regulation essentially requires Skywest to comply with Section 504 of the Rehabilitation Act and, therefore, to provide her with medical oxygen.

Before parsing the specifics of Boswell's claim, it is important to recognize that it is a "fundamental tenet of statutory construction that a court should not construe a general statute to eviscerate a statute of specific effect." [42] To agree with Boswell's argument that Section 382.7 requires Sky-West to comply with Section 504, the Court would have to interpret the general language of section 382.7 as trumping Section 121.574, which specifically allows air carriers the discretion of whether or not to provide medical oxygen. The Court declines to adopt this approach because Boswell's reading of this general regulation conflicts with both the specific regulations in section 121.574 and the statute that the regulation implements. If Section 382.7 in fact affirmatively obligates airlines to provide medical oxygen to passengers, then the discretionary language in section 121.574 (an airline *"may* allow a passenger" to operate oxygen provided by the airline) simply makes no sense.

Moreover, it is "axiomatic that a regulation cannot expand the scope of the statute under which it is promulgated." [43] For the reasons previously explained in Part I of this opinion, Section 504 of the Rehabilitation Act does not require Sky-West to provide medical oxygen on its St. George to Salt Lake City route. Boswell's interpretation of Section 382.7, however, would read it as extending beyond the statute. A better reading of the section is that the language in it (airlines shall modify practices "consistent with the standards of section 504 of the Rehabilitation Act") is simply designed to track Section 504 and reaffirm carriers' obligations to comply with Section 504.

Any doubt on this matter is completely laid to rest by the Department of Transportation's own interpretation of section 382.7. In its commentary on the provision, the Department specifically stated that the section did not cover issues such as the one before the Court:

> This provision is not intended to replace the rulemaking process with respect to across-the-board changes in carrier policies and practices. For example, the Department does not intend, in implementing and enforcing this provision, to

---

**42.** *State Bank of Southern Utah v. Gledhill,* 76 F.3d 1070, 1078 (10th Cir.1996); *See also Franklin v. United States,* 992 F.2d 1492, 1502 (10th Cir.1993); *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 384, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992).

**43.** *Grupo Indus. Camesa v. United States,* 85 F.3d 1577, 1579 (Fed.Cir.1996); *See also Village of Los Ranchos de Albuquerque v. R.H. Barnhart,* 906 F.2d 1477, 1484, n. 6 (10th Cir.1990), *cert. denied* 498 U.S. 1109, 111 S.Ct. 1017, 112 L.Ed.2d 1099 (1991).

address *industry-wide issues like on-board oxygen use by passengers,* additional accommodations for passengers with hearing impairments, or smoking in airports. The provision is intended to deal with accommodations that take the form of case-by-case exceptions to otherwise reasonable general policies or practices of carriers.[44]

Under the DOT's reading of its regulation, Boswell cannot claim that section 382.7 mandates that SkyWest provide its customers with medical oxygen. The Tenth Circuit has instructed that "[c]ourts must give substantial deference to an agency's interpretation of its own regulations. The agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation."[45] Boswell has not explained how the interpretation of the Department is somehow plainly erroneous. For all these reasons, Boswell's claim that section 382.7 requires SkyWest to provide her with medical oxygen must be rejected.

Finally, Boswell argues that one last regulation requires SkyWest to provide medical oxygen. Boswell cites 49 C.F.R. 27.77, which provides:

Any air carrier receiving Federal financial assistance from the Department of Transportation under the Essential Air Service program shall, as a condition of receiving such assistance, comply with *applicable* requirements of this part and *applicable* section 504 and ACAA rules of the Department of Transportation.[46]

Boswell cannot bootstrap an argument for provision of medical oxygen into this regulation. The regulation is plainly limited to requiring airlines to follow "applicable" requirements of Section 504 and ACAA. For the reasons previously explained, the applicable statutory and regulatory requirements to not require SkyWest to provide medical oxygen to passengers on the St. George to Salt Lake City flight. This section does not, by itself, create a stand-alone right to oxygen. Moreover, such a reading would conflict with the commonplace rule that where a general provision and a specific provision conflict, the specific provision controls.[47] In this case, the specific provision—Section 121.574—gives SkyWest the option, but not the requirement, to provide medical oxygen.

For all these reasons, the ACAA does not require SkyWest to provide medical oxygen to passengers on its St. George to Salt Lake City route. Summary Judgment is therefore granted for SkyWest on Count I of Boswell's Complaint.

\*     \*     \*     \*     \*     \*

Although the Court has granted summary judgment for the defendant, it is not unsympathetic to Ms. Boswell's situation. The Court accepts her representations that the lack of in-flight oxygen causes serious difficulties for her. At the same time, the Court recognizes that SkyWest has safety concerns about how to provide such oxygen. SkyWest has noted that the ValueJet crash in the Everglades was caused, at least in part, by the presence of oxygen on the flight. After that crash, the National Transportation Safety Board ("NTSB") issued a notice of proposed rulemaking to prohibit the carriage of oxidizers, including compressed oxygen, as cargo aboard all passenger-carrying aircraft and to restrict the number of compressed oxy-

---

44. 63 Fed.Reg. 10528, 10529 (3/4/1998).

45. *Smith v. Midland Brake, Inc.,* 180 F.3d 1154, 1165 n.5 (10th Cir.1999) (internal quotation omitted).

46. 49 C.F.R. 27.77 (1996) (emphases added).

47. *See State Bank of Southern Utah v. Gledhill,* 76 F.3d 1070, 1078 (10th Cir.1996); *Franklin v. United States,* 992 F.2d 1492, 1502 (10th Cir.1993); *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 384, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992).

gen cylinders allowed in the passenger compartment.[48] In response to comments chiefly related to the inconvenience created to both airlines and passengers by its proposed rules, the NTSB ultimately adopted regulations restricting, rather than prohibiting, the number of oxygen canisters that can be carried in the airplane's cargo hold. All this suggests that industry-wide issues such as in-flight medical oxygen are better addressed by regulatory agencies rather than by judicial interpretation of vague regulatory provisions.

For the foregoing reasons, SkyWest's Motion for Summary Judgment is GRANTED. This case is dismissed with prejudice in its entirety. The Clerk of the Court is directed to enter judgment accordingly, with each party to bear its own fees and costs.

SO ORDERED.

---

48.   64 Fed.Reg. 45388, 45390 (8/19/99).